Charles M. KRUTSINGER, Petitioner

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 08SC378.

Supreme Court of Colorado,
En Banc.

Oct. 13, 2009.

Rehearing Denied Nov. 23, 2009.

The Dubofsky Law Firm, P.C., Jean E. Dubofsky, Boulder, Colorado, Springer & Steinberg, P.C., Michael P. Zwiebel, Denver, Colorado, Dean Neuwirth P.C., Dean Neuwirth, Denver, Colorado, Attorneys for Petitioner.

John W. Suthers, Attorney General, Majid Yazdi, Assistant Attorney General, Denver, Colorado, Attorneys for Respondent.

Justice COATS delivered the Opinion of the Court.

Krutsinger petitioned for review of the court of appeals' judgment affirming his convictions for multiple sexual-assault-on-a-child and incest-related crimes. *See People v. Krutsinger*, No. 06CA0532, 2008 WL 963034 (Colo.App. April 10, 2008) (not selected for official publication). On direct appeal, the court of appeals accepted the People's concession that the trial court erred in excluding testimony from a therapist of the defendant's stepdaughter, on grounds of privilege. Rather than deciding whether the error was harmless, however, the court of appeals remanded for a hearing to obtain the therapist's testimony and to determine whether that testimony was constitutionally material to the defendant's case. *See People v. Krutsinger*, 121 P.3d 318 (Colo.App.2005). Upon recertification, the court of appeals agreed with the trial court's assessment that the error was not material and therefore not of constitutional magnitude, and it found the error harmless according to the standard for evaluating nonconstitutional error. The court of appeals therefore affirmed the defendant's convictions and ten-year sentence.

By conditioning a designation of federal constitutional error on a determination that the error would impact the verdict sufficiently to be constitutionally material, the court of appeals applied the wrong legal standard.

Because, however, we determine that the exclusion of Dr. Howard's testimony did not deprive the defendant of a meaningful opportunity to present a complete defense, the error did not rise to the level of federal constitutional error, even under the proper standard. Because we also find that the error was harmless according to the standard for nonconstitutional error in this jurisdiction, the judgment of the court of appeals is affirmed.

## I.

Charles M. Krutsinger was charged with ten counts of sexual assault on a child, nine of which were allegedly committed as part of a pattern of abuse, as well as ten counts of sexual assault on a child by one in a position of trust and ten counts of aggravated incest. All of the counts alleged, in the same generic terms, that Krutsinger subjected his stepdaughter to sexual contact between the years 1991 and 1997. The jury returned guilty verdicts on all counts, and the court imposed the minimum allowable sentence for each count, all to be served concurrently. Because the pattern-of-abuse verdicts required sentencing to at least the midpoint of the presumptive range for a class 3 felony, the defendant was sentenced on some counts to terms as great as ten years in the department of corrections.

At age sixteen, the defendant's stepdaughter first accused him of sexually assaulting her, years earlier when she was a young child. In a number of statements and interviews before trial, and again in her testimony at trial, she accused him of subjecting her, over a period of years, to continuous acts of sexual contact of two general types. She described how he at times would rub his genital region against her from behind in simulated acts of sexual intercourse, and how at other times he would direct her hands inside his pants and underwear and cause her to manipulate his penis.

The defendant testified on his own behalf and denied all of the accusations. Because the acts described by his stepdaughter were allegedly committed much earlier and over a period of years, with only general references to time and place, and because she was the only witness professing first-hand knowledge of the assaults, which by their very nature were not susceptible of physical corroboration, the defense focused heavily on the circumstances of and possible motives for her delayed outcry and the numerous inconsistencies in her testimony and various pretrial statements. In anticipation of these defenses, the prosecution presented, in addition to the stepdaughter's own testimony about these earlier statements, the testimony of her mother and others to whom she claimed to have made some manner of outcry statement, including a childhood friend, her school counselor, her school resource officer, and a sheriff's department investigator. The prosecution also presented an expert on the psychology of child sexual assault victims, along with a videotape of an interview conducted by a victim advocacy center.

The evidence presented at trial concerning her delayed outcry was to the effect that in the fall of 2002, the stepdaughter, after several abortive attempts, confided in her mother that she had been sexually abused as a child and, at some point thereafter, indicated that the perpetrator may have been her stepfather. Shortly after a session with a therapist, Dr. Patricia Howard, to whom her mother and stepfather had sent her, the stepdaughter told her mother in a long-distance telephone conversation that she was certain her stepfather was the perpetrator; and although her mother returned home several days later and asked for time to consider how to proceed, she made explicit outcry to her school counselor the next day. She was subsequently interviewed by the school resource officer and a sheriff's department investigator, and even later by a victim advocacy center.

Through cross-examination, defense counsel exposed the stepdaughter's growing behavioral problems, substance abuse, and increasingly poor academic performance. She was forced to concede her dislike for her stepfather and particularly what she considered to be his interference in her affairs by communicating with her teachers, which effectively exposed lies she had told about certain school assignments. She also conceded disputes with her mother, who at one point,

before retracting it, made a demand that she move to Washington state to live with her father. Mainly, however, defense counsel was able to expose numerous inconsistencies in her testimony and previous statements, including inconsistencies in her accounts concerning when the assaults began and ended, and how frequently they occurred; the nature and location of the last assault; whether the defendant ejaculated during the assaults; when and where the assaults typically occurred and how the defendant was typically dressed; other people she claimed to have told about the assaults; precisely what and when she told her mother about the involvement of her stepfather; and the details of her meetings with a family friend who offered to help, her school counselor, the sheriff's investigator, and the therapist, Dr. Howard.

With regard to Dr. Howard in particular, defense counsel confronted the defendant's stepdaughter with the therapist's notes of their first session, which indicated that she had told Howard she thought the assaults continued until the fourth grade, despite her testimony and other pre-trial interviews indicating that they continued until the sixth grade. The stepdaughter was quite adamant that she had always described the assaults as continuing from about her second through sixth grade years, while the family lived in one particular residence. In addition, despite asserting at trial that she had always been quite certain that her stepfather was the perpetrator, she admitted telling Howard only that she was "almost certain," explaining that she was reluctant in part because Howard had informed her of Howard's legal duty to report any accusation against the defendant.

At the conclusion of the People's case, defense counsel sought to endorse Howard as a rebuttal witness. After an in-camera hearing, in which Dr. Howard testified that she had spoken with and turned over her notes to a defense investigator when shown a release signed by the child's mother, the trial court construed the release as extending only to her records and not actual testimony about the sessions. Defense counsel offered to elicit from Dr. Howard live testimony concern-

ing the matters described in her notes of the first session, namely that the stepdaughter trusted and loved some of her teachers, apparently to discredit her explanation for failing to report sooner; that she was only beginning to remember more about the assaults but was almost sure they were committed by her stepfather and continued until the fourth grade; and that she did not like her stepfather and thought her mother also did not love her and was covering up for him. The court denied the proffer on grounds of psychologist-patient privilege.

On appeal, the People confessed error in the exclusion of Dr. Howard's proffered testimony but asserted that the error was harmless. Although the court of appeals rejected the defendant's other assignments of error, it held that by testifying about her sessions with Dr. Howard, the defendant's stepdaughter effectively waived any psychologist-patient privilege. Rather than considering the harmfulness of the error, however, the appellate court remanded for a determination by the trial court, after entertaining additional testimony from Dr. Howard, whether her testimony would have been both favorable to the accused and constitutionally material, and therefore require reversal as federal constitutional trial error; and even if these conditions were not met, whether its exclusion required reversal under the ordinary harmless-error standard.

On remand, the district court heard from Dr. Howard, who testified from her notes, admitting that she lacked any independent recollection of what occurred during the therapy sessions. She also testified, however, that she would not have told the child about her reporting obligations because that would have amounted to circumventing the law. The district court ultimately determined that its error in treating Howard's proffered testimony as privileged was not constitutionally material and was, in fact, harmless. Upon recertification to the court of appeals, that court agreed that the error was not of constitutional magnitude and determined, for reasons of its own, that the error was harmless.

We granted the defendant's petition for a writ of certiorari challenging the court of appeals' imposition of a materiality require-

ment as a prerequisite to classification of the trial court's error as federal constitutional error, as well as its ultimate determination that the exclusion of Dr. Howard's proffered testimony was harmless.

## II.

Federal constitutional errors that are structural in nature, infecting the entire trial process and rendering the trial fundamentally unfair, require automatic reversal. *See, e.g., Neder v. United States*, 527 U.S. 1, 7–8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *Sullivan v. Louisiana*, 508 U.S. 275, 281, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); *Brecht v. Abrahamson*, 507 U.S. 619, 629–30, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Rose v. Clark*, 478 U.S. 570, 578, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Most federal constitutional errors, however, are in the nature of trial, rather than structural, error and can be harmless. *See, e.g., Neder*, 527 U.S. at 8, 119 S.Ct. 1827; *Arizona v. Fulminante*, 499 U.S. 279, 306–07, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). These federal constitutional trial errors, at least when properly preserved and asserted on direct rather than collateral review, are nevertheless subject to a more onerous harmless-error standard than nonconstitutional trial errors in federal criminal cases. *See Brecht*, 507 U.S. at 637, 113 S.Ct. 1710.

The constitutional harmless-error standard fashioned by the United States Supreme Court requires that before a federal constitutional error can be held harmless, the reviewing court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24, 87 S.Ct. 824. In articulating this standard, the Supreme Court made clear that it considered there to be little, if any, difference between its requirement that the beneficiary of a constitutional error prove beyond a reasonable doubt that the error complained of did not contribute to the verdict and its earlier holding in *Fahy v. Connecticut*, 375 U.S. 85, 84

S.Ct. 229, 11 L.Ed.2d 171 (1963), that the defendant in that case was sufficiently prejudiced to require reversal where there was a reasonable possibility that the admission of unconstitutionally seized evidence might have contributed to his conviction. By contrast, the harmless-error standard applicable to federal nonconstitutional trial error, which is grounded in federal statute and rule, *see* 28 U.S.C. § 2111; Fed.R.Crim.P. 52(a), requires reversal only if the error had a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht*, 507 U.S. at 637–38, 113 S.Ct. 1710; *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

While the difference between the two standards is somewhat imprecise, and has even been characterized as slight, *see Strickler v. Greene*, 527 U.S. 263, 300, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (Souter, J., concurring in part and dissenting in part), the categorization of any error as federal constitutional error is nevertheless significant. Although both standards are outcome determinative, in the sense that the appropriateness of reversal as a remedy is made a function of the error's likely impact on the jury's verdict, the *Kotteakos* or nonconstitutional harmless-error standard is clearly the "less onerous" of the two, meaning it will more readily produce a finding of harmlessness. *See Brecht*, 507 U.S. at 623, 113 S.Ct. 1710. In addition, however, the designation of any particular error as federal constitutional error has jurisdictional significance, rendering the appropriate remedy for that error a federal question, to be resolved according to a federally determined standard, subject to federal review. *See Chapman*, 386 U.S. at 21, 87 S.Ct. 824.

Since the Supreme Court made clear in *Fahy* and *Chapman* that automatic reversal is not required for all federal constitutional errors, it has designated a number of particular errors structural, requiring automatic reversal,[1] and a number of others federal

---

1. Such structural errors include the complete denial of counsel, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), having a biased judge preside over trial, *Tumey v. Ohio*,

273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), admitting a coerced confession, *see Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958), having a magistrate preside over trial

constitutional trial error, subject to the *Chapman* harmless-error standard.[2] It has also, however, classified certain other actions or omissions by the government or defense counsel, whether or not error in and of themselves, as federal constitutional error when their effect is to deprive a defendant of fundamental fairness in the trial process. Application of the *Chapman* harmless-error standard to this general class of constitutional error would be superfluous because the conduct at issue can rise to the level of constitutional error only if it can be shown to have impacted the verdict at least as clearly as would bar a finding of harmlessness according to the *Kotteakos*, and therefore *Chapman*, standard. *See Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

The Supreme Court has found this outcome-determinative approach to be appropriate only for constitutional claims which "by their very nature require a showing of prejudice with respect to the trial as a whole," *Delaware v. Van Arsdall*, 475 U.S. 673, 679,

106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), and it has thus far applied it only to actions or omissions of two general types: incompetent representation by defense counsel, *see Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and governmental denial of access to favorable evidence, *see United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); *see generally* 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.3(a), at 339 (3d ed. 2007) ("The Supreme Court has characterized various constitutional standards as combining to create 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" (quoting *Arizona v. Youngblood*, 488 U.S. 51, 55, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)) ). The degree of prejudice, or likely impact on the verdict, required to elevate such objectionable conduct to the level of federal constitutional error—what has been referred to as the standard of materiality—has been articulated by the Supreme

---

without the defendant's consent, *Gomez v. United States*, 490 U.S. 858, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989), racial discrimination in the selection of a grand jury, *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), the denial of self-representation, *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), the denial of a public trial, *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), and defective reasonable-doubt instruction, *Sullivan*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182. *See also Washington v. Recuenco*, 548 U.S. 212, 213, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006) ("Only in rare cases has this Court ruled an error 'structural,' thus requiring automatic reversal."). These types of errors "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence … and no criminal punishment may be regarded as fundamentally fair.'" *Neder*, 527 U.S. at 8–9, 119 S.Ct. 1827 (quoting *Rose*, 478 U.S. at 577–78, 106 S.Ct. 3101)).

**2.** *E.g., Deck v. Missouri*, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005) (shackling the defendant in front of the jury); *Neder*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (omission of an element of the offense from jury instructions); *Brecht*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (prosecutor's improper comment on defendant's silence following *Miranda* warnings); *Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) (use of a vague or impre-

cise aggravating factor in a capital sentencing proceeding); *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (admission of evidence at the sentencing stage of a capital case in violation of the right to counsel); *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987) (unconstitutional standard for obscenity in jury instruction); *Rose*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (jury instruction containing an unconstitutional conclusive presumption); *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) (admission of accomplice's confession without the benefit of cross-examination in violation of the Confrontation Clause); *Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (denial of the right to be present during a trial proceeding); *Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977) (admission of evidence obtained in violation of an accused's right to counsel); *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) (admission at trial of an out-of-court statement of a non-testifying codefendant in violation of the Confrontation Clause); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (admission of evidence obtained in violation of the Fourth Amendment); *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (denial of indigent's right to appointed counsel at a preliminary hearing); *Anderson v. Nelson*, 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968) (prosecutor's improper comment on defendant's failure to testify).

Court in various terms, over a span of years, and according to the nature and circumstances of the conduct at issue.

After considerable evolution, however, the Court has come to describe this standard, most particularly in the context of a failure to disclose favorable evidence, as a reasonable probability that the result would otherwise have been different. *See Bagley,* 473 U.S. at 678–83, 105 S.Ct. 3375 (recounting history of various reformulations and adopting *Strickland* standard as sufficiently flexible for all failure to disclose cases); *see also Kyles,* 514 U.S. at 432–37, 115 S.Ct. 1555 (clarifying the contours of that standard). While the Supreme Court has made abundantly clear that it does not intend its use of the term "reasonable probability" to require a showing that the defendant would more likely than not have received a different result, it has also made clear that it does intend to require a demonstration of greater harm than would be sufficient for reversal under the *Kotteakos* harmless-error standard for federal nonconstitutional error, *Kyles,* 514 U.S. at 436, 115 S.Ct. 1555, and necessarily therefore, under the *Chapman* constitutional harmless-error standard, *see Strickler,* 527 U.S. at 291, 119 S.Ct. 1936 (finding a "reasonable *possibility,*" although not a "reasonable *probability,*" of a different result)(emphasis in original); *see also id.* at 300, 119 S.Ct. 1936 (Souter, J., concurring in part and dissenting in part) (suggesting that the constitutional materiality standard be distinguished from the *Chapman/Fahy* "reasonable possibility" standard by use of the term "significant possibility" rather than "reasonable probability").[3]

Whether particular misconduct or a particular court ruling is capable of being viewed as constitutional error in itself, or can be so viewed only if the defendant first establishes a reasonable probability of prejudicial impact

on the verdict, has not always been clear. *See generally* 7 LaFave, § 27.6(d), at 117 n. 76 (characterizing this issue as one that has repeatedly divided the Court in the years since *Chapman* ). In *Van Arsdall,* however, the Supreme Court expressly rejected an invitation to mandate a showing of " 'outcome determinative' prejudice" in order to state a violation of the Confrontation Clause. 475 U.S. at 679–80, 106 S.Ct. 1431. *But see id.* at 685, 106 S.Ct. 1431 (White, J., concurring) ("It makes much more sense to hold that no violation of the Confrontation Clause has occurred unless there is some likelihood that the outcome of the trial was affected."). Expressly distinguishing a violation of the Confrontation Clause from those "constitutional claims that require a showing of prejudice with respect to the trial as a whole," the Court held that "the focus of the Confrontation Clause is on individual witnesses." *Id.* at 680, 106 S.Ct. 1431. In *Van Arsdall,* the Court found the trial court's limitation on cross-examination, without regard to materiality, to be constitutional error, subject to the *Chapman* harmless-error standard. *Id.*

In *Richmond v. Embry,* 122 F.3d 866 (10th Cir.1997), a case heavily relied on by the court of appeals below, the Tenth Circuit Court of Appeals, however, held that the trial court's exclusion of evidence of an alternate sexual partner amounted to the denial of a right arising under the Fifth and Fourteenth Amendment guarantees of due process and the Sixth Amendment right to compulsory process, rather than a right arising under the Sixth Amendment's Confrontation Clause. Reasoning further that in order to establish a violation of the right to compulsory process, a fair trial, or due process, a defendant must demonstrate a denial of fundamental fairness, that court found it appropriate to apply the outcome-determinative approach of the

---

**3.** Since some probability greater than zero would normally be assigned to any outcome or occurrence that is not impossible, it is not readily apparent why a "reasonable possibility" and a "reasonable probability" should convey different meanings. While it has always been important to distinguish an outcome that is merely "possible" from one that is "probable," in the sense that it is more likely than not, the Supreme Court has repeatedly made clear that its use of the term "reasonable probability" in this context is not

intended to mean that an outcome or occurrence must actually be "probable." Nevertheless, confusion about this point appears to have motivated Justice Souter's suggestion to differently modify the term "possibility," rather than introducing the notion of "probability" at all. Whatever the merits of this usage, however, it seems beyond dispute that the Supreme Court intends a greater likelihood of occurrence when it refers to a "reasonable probability," than when it refers to a "reasonable possibility."

Supreme Court's denial-of-access cases, conditioning classification of the error in that case as "constitutional error" on the materiality of the excluded evidence. *Id.* at 872.

Whether or not the Tenth Circuit's conclusion concerning a misapplication of Colorado's Rape Shield Statute can be squared with United States Supreme Court jurisprudence, the rationale of *Richmond* cannot be applied equally to the exclusion of Dr. Howard's testimony in this case. Dr. Howard had no first-hand knowledge of the charged offenses and clearly was not an alternate suspect. Her testimony was offered solely to impeach the credibility of the defendant's stepdaughter.

■ Error in limiting a defendant's ability to challenge the credibility of the evidence against him, either by restricting the cross-examination of prosecution witnesses or by restricting the presentation of defense evidence, implicates "the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.' " *Crane v. Kentucky,* 476 U.S. 683, 690–91, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting *United States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)) (finding denial of right to present evidence challenging credibility of defendant's confession to be constitutional error subject to *Chapman* harmless-error analysis). Whether the guarantee of a *meaningful* opportunity to present a complete defense is "rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment," it cannot be denied without violating the federal constitution. *Id.* at 690, 106 S.Ct. 2142 (internal citations omitted).

■ At least with regard to impeachment of the prosecution's case, the Supreme Court has largely resolved the question of the appropriate standard. *See id.* at 690–91, 106 S.Ct. 2142; *Van Arsdall,* 475 U.S. at 679–84, 106 S.Ct. 1431. Although the nature and extent of any ruling limiting the presentation of defense evidence will necessarily determine whether it amounts to constitutional error, just as the nature and extent of the trial court's limitation on cross-examination were determinative in *Van Arsdall,* the focus

of the inquiry remains on individual witnesses rather than the trial as a whole. As the Supreme Court made clear with regard to the Confrontation Clause in particular, a defendant necessarily states a violation of his constitutional right to present a defense by demonstrating that "(a) reasonable jury might have received a significantly different impression of a witness's credibility" had the court not erroneously excluded otherwise appropriate evidence. *See Van Arsdall,* 475 U.S. at 680, 106 S.Ct. 1431.

Nor has this court previously suggested otherwise. In *People v. Melendez,* 102 P.3d 315 (Colo.2004), although we referenced *Valenzuela–Bernal* as support for the proposition that the right to present defense evidence is not absolute, *see Melendez,* 102 P.3d at 320, we did not condition a finding of constitutional error in that case on the demonstration of a reasonable probability or reasonable likelihood that the outcome of the trial would have been different but for the trial court's misapplication of the sequestration rule. Quite the contrary, given the nature of the testimony for which the individual witness was offered, we found his complete exclusion to be constitutional error, in itself, and we reversed because we were not convinced beyond a reasonable doubt of its harmlessness, as required by the more onerous *Chapman* standard. *Id.* at 321–22; *see also Golob v. People,* 180 P.3d 1006, 1013–14 (Colo.2008) (expressly applying harmless-beyond-a-reasonable-doubt standard to abridgment of defendant's right to call witnesses in his defense).

■ The court of appeals therefore erred in requiring a finding of constitutional materiality as a prerequisite to treating the trial court's evidentiary error as federal constitutional error. Rather than presuming that the exclusion of defense impeachment evidence could rise to the level of federal constitutional error only if its admission would have, considering the trial as a whole, created a reasonable doubt, the court of appeals should have inquired whether the trial court's evidentiary ruling, in and of itself, deprived the defendant of any meaningful opportunity to present a complete defense.

### III.

It does not follow, of course, that every restriction on a defendant's attempts to challenge the credibility of evidence against him, or even every erroneous evidentiary ruling having that effect, amounts to federal constitutional error. In both *Van Arsdall* and *Crane*, the Court emphasized the wide latitude that must remain with trial judges and the Court's traditional reluctance to impose constitutional constraints on the power of states to exclude evidence through the application of evidentiary rules. *See Crane*, 476 U.S. at 689, 106 S.Ct. 2142; *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431. In each of those cases, restriction on the defendant's efforts to challenge the credibility of evidence against him stated the violation of a federal constitutional right only because the trial court's ruling, under the circumstances of each case, effectively barred the defendant from meaningfully testing evidence central to establishing his guilt. In *Van Arsdall*, the Court concluded that the defendant had successfully stated a violation of the Confrontation Clause only because the trial court prohibited "*all* inquiry" into the possibility of prosecution bias by a witness who placed the defendant at the scene, near the time of the murder, and because a "reasonable jury might have received a significantly different impression of [that witness's] credibility." 475 U.S. at 679–80, 106 S.Ct. 1431.

By contrast, the defendant in this case was not prohibited from demonstrating motive or bias on the part of the witness or from exposing to the jury virtually any additional facts from which they could draw inferences relating to her reliability. The trial court's error merely prohibited Dr. Howard from describing in live testimony the matters contained in her notes, with regard to which the court held the patient-psychologist privilege to already have been waived. Defense counsel was permitted to question the witness about the content of Dr. Howard's notes and, in fact, expressly challenged her to explain her statement that the assaults stopped when she was in the fourth grade, which was inconsistent with her testimony that they continued until the sixth grade. Although not prohibited from doing so, defense counsel made no attempt to question the witness about her other statements noted in his offer of proof or to have the notes themselves introduced into evidence.

Perhaps more importantly, however, defense counsel was not restricted from challenging the witness's credibility by drawing the jury's attention to numerous inconsistencies between her testimony and either her various pretrial statements or the contradictory testimony of other witnesses; her failure to make outcry sooner, despite being surrounded by adults whom she admittedly trusted and respected; and her dislike for, and potential motives for lying about, her stepfather. With regard, in particular, to Dr. Howard's testimony on remand to the effect that she would not have warned the witness of her duty to report, it was undisputed that the defendant's stepdaughter was in fact told about the statutory duty by her school counselor. Moreover, she separately explained her reluctance to positively name her stepfather as the perpetrator, in a number of her early attempts at outcry, on the grounds that she was simply not yet psychologically ready. In any event, however, defense counsel never suggested in his offer of proof that Dr. Howard would also contradict this statement by the witness.

Although perhaps no more precise than the "reasonable probability" formula of the Supreme Court's outcome–determinative approach, the standard or test for assessing whether a defendant's right to confront or present a defense has been violated by evidentiary rulings is clearly dependent upon the extent to which he was permitted to subject the prosecutor's case to "meaningful adversarial testing." *Crane*, 476 U.S. at 691, 106 S.Ct. 2142. And while we have previously characterized a defendant's right to call witnesses in his own defense as a constitutional right, we have found an abridgment of that right only where the defendant was denied virtually his only means of effectively testing significant prosecution evidence. *See, e.g., Golob*, 180 P.3d at 1013 (constitutional error in excluding expert testimony and thereby leaving unchallenged the most significant item of evidence against defendant). Under the circumstances of this case, any

evidentiary error committed by the trial court in limiting testimony by Dr. Howard did not rise to the level of federal constitutional error.

## IV.

■ While this jurisdiction is not bound by the Supreme Court's articulation of the federal nonconstitutional harmless-error standard, Crim. P. 52(a) is almost identical to Fed.R.Crim.P. 52(a), and this court has long cited *Kotteakos* with favor and paraphrased its articulation of that standard. *See, e.g., People v. Quintana,* 665 P.2d 605, 612 (Colo. 1983) ("[T]he appropriate question is whether the error substantially influenced the verdict or affected the fairness of the trial proceedings."), *see also Liggett v. People,* 135 P.3d 725, 733 (Colo.2006); *People v. Summitt,* 132 P.3d 320, 327 (Colo.2006); *Medina v. People,* 114 P.3d 845, 857 (Colo.2005); *People v. Welsh,* 80 P.3d 296, 310 (Colo.2003); *Masters v. People,* 58 P.3d 979, 1002–03 (Colo.2002). We have not, however, always maintained the Supreme Court's strict hierarchical distinction between a "reasonable possibility" and a "reasonable probability." *See, e.g., Salcedo v. People,* 999 P.2d 833, 841 (Colo.2000) (recasting, without expressly acknowledging it, the "reasonable possibility" test of *Tevlin v. People,* 715 P.2d 338, 342 (Colo.1986), as a "reasonable probability" standard). To complicate matters further, in the last decade we have regularly equated the Crim. P. 52(a), nonconstitutional harmless-error standard with a failure to establish a reasonable probability that the error contributed to the verdict. *See, e.g., Yusem v. People,* 210 P.3d 458, 469–70 (Colo.2009); *Crider v. People,* 186 P.3d 39, 42 (Colo.2008); *Raile v. People,* 148 P.3d 126, 134 (Colo.2006); *Mata–Medina v. People,* 71 P.3d 973, 980 (Colo.2003); *Grant v. People,* 48 P.3d 543, 554 (Colo.2002); *People v. Garcia,* 28 P.3d 340, 344 (Colo. 2001).

Despite the fact that both are outcome-determinative standards to which the term "reasonable probability" has been applied, we have never suggested that the harmless-error standard in this jurisdiction requires the same showing with respect to impact that would be required to establish federal constitutional materiality in the nondisclosure context; or that a defendant in this jurisdiction has a heavier burden to demonstrate harmlessness than would be true under the *Kotteakos,* federal nonconstitutional harmless-error standard. It is clearly the case, in fact, that by "reasonable probability" we also intend something less than a preponderance of the evidence; and similarly, that the Crim.P. 52(a) standard, just as the federal *Kotteakos* standard, will more readily produce a finding of harmlessness than the *Chapman* standard of constitutional harmless error.

Under our own harmless-error standard, the evidentiary error in this case was harmless. Although the harmless-error standard is outcome determinative and therefore must account for an error's impact in light of the evidence as a whole, where the credibility of a single witness is so central to the case against the defendant, the question of harmlessness is closely related to, if not precisely identical with, the question whether he has been deprived of a right to meaningfully challenge credibility. For much the same reasons that the defendant in this case was not deprived of his constitutional right to impeach the credibility of his stepdaughter, the trial court's evidentiary error did not substantially influence the verdict or affect the fairness of the trial proceedings.

The defendant was permitted to, and did, thoroughly expose the witness's possible motive or bias, her prior inconsistent statements, various reasons why her ability to perceive or recollect the key events may have been limited, and the extent to which her recollection of events was disputed by others with a reason to know. Although the trial court may have erred by restricting Dr. Howard's testimony about her first session with the defendant's stepdaughter, its error did not preclude the defense from speaking with the therapist and using her notes to impeach the stepdaughter's testimony. Nothing in the defendant's offer of proof suggested testimony of a retraction or of equivocation concerning her claims of molestation at the hands of the defendant. At most, the court's error deprived the jury of hearing from one additional witness about similar inconsistencies in the stepdaughter's

accounts of the assaults and her own explanations for her late outcry.

Under these circumstances, the defendant has not demonstrated that the exclusion of Dr. Howard's live testimony substantially influenced the verdict or affected the fairness of the trial.

## V.

Although the trial court, at the direction of the court of appeals, applied an incorrect test to determine whether its earlier error amounted to federal constitutional error, its ultimate determination that the error was both nonconstitutional and harmless was correct. The judgment of the court of appeals affirming the defendant's convictions and sentence is therefore affirmed.