2013 CO 26

**MILE HIGH CAB, INC., a Colorado corporation, Petitioner–Appellant**

v.

**COLORADO PUBLIC UTILITIES COMMISSION, Respondent–Appellee**

and

**SuperShuttle International Denver, Inc.; and Colorado Cab Company, LLC, d/b/a Denver Yellow Cab and/or Boulder Yellow Cab and/or Boulder SuperShuttle and/or Boulder Airporter and/or Boulder Airport Shuttle and/or Boulder Express Shuttle; and MKBS, LLC, d/b/a Metro Taxi and/or South Suburban Taxi, Intervenors.**

**Supreme Court Case No. 11SA312**

Supreme Court of Colorado.

April 22, 2013

---

Attorneys for Petitioner-Appellant: Law Office of Prof. Thomas D. Russell, Ph.D., LLC, Professor Thomas D. Russell, Ph.D., Denver, Colorado, Institute for Justice, William H. Mellor, Robert J. McNamara, Dana Berliner, Arlington, Virginia.

Attorneys for Respondent-Appellee: John W. Suthers, Attorney General, Mariya Cassin, Assistant Attorney General, Denver, Colorado.

Attorneys for Intervenors SuperShuttle International Denver, Inc.; and Colorado Cab Company, LLC, d/b/a Denver Yellow Cab and/or Boulder Yellow Cab and/or Boulder SuperShuttle and/or Boulder Airporter and/or Boulder Airport Shuttle and/or Boulder Express Shuttle: Dufford & Brown, P.C., Richard L. Fanyo, Richard L. Corbetta, Mark T. Valentine, Denver, Colorado.

Attorneys for Intervenor MKBS, LLC, d/b/a Metro Taxi and/or South Suburban Taxi: Harris Karstaedt Jamison & Powers P.C., Christopher M. Gorman, Robert W. Harris, Englewood, Colorado.

JUSTICE COATS delivered the Opinion of the Court.

¶ 1 Mile High Cab appealed directly to this court, pursuant to section 40–6–115(5), C.R.S. (2012), from the judgment of the district court affirming the denial of its application for a Certificate of Public Convenience and Necessity. After a lengthy hearing, which included expert testimony both for and against the application, the administrative law judge to whom the application had been assigned issued a recommended decision, finding that the several incumbent carriers opposing the application had adequately proved that public convenience and necessity did not require granting the application and that the issuance of the certificate would be detrimental to the public interest. Although it initially ordered a remand for further evidence, the Public Utilities Commission ultimately granted the intervening carriers' motions for reconsideration and adopted the recommendation of the ALJ to deny the application. On Mile High's petition for judicial review, the district court affirmed.

¶ 2 Because the record does not clearly contain the finding statutorily required for a denial of Mile High's application by the Public Utilities Commission—that the parties opposing the application proved by a preponderance of the evidence that the public convenience and necessity did not require granting the application and that the issuance of a certificate would actually be detrimental to the public interest—the judgment of the district court is reversed, and the case is remanded with directions to return the matter to the Public Utilities Commission for further action consistent with this opinion.

## I.

¶ 3 In September 2008 Mile High Cab, Inc. filed an application to operate a taxicab service in the Denver metro area. Several existing carriers— Metro Cab, Yellow Cab, and SuperShuttle International—intervened, and the application was heard by an administrative law judge in September 2009. Following a 13–day hearing, which included expert testimony both supporting and opposing the application, the ALJ issued a decision of some 230 paragraphs, recommending that the Public Utilities Commission deny the application.

¶ 4 The ALJ had little difficulty in finding that Mile High established its operational and financial fitness to provide the proposed service, which he understood to statutorily create a rebuttable presumption of public need. He also found, however, that Mile High's proposed service would likely cause an oversupply of the market of a kind that was highly unlikely to lead to the robust competition envisioned by the applicable statutory standard for new entries, and in fact the proposed service could very well result in impaired services, higher rates, and ultimately the type of destructive competition the Commission was charged with protecting against. As a result, it found that the intervening carriers had sustained their statutory burden of rebutting the presumption of a public need for the proposed service and had adequately proved that the proposed service would be detrimental to the public interest.

¶ 5 In October 2010, after considering the exceptions and other motions of Mile High and the intervenors, the Commission ordered that the evidentiary record be reopened and the docket remanded to the ALJ to gather evidence on current conditions in the taxicab market and, particularly, the effects of another recent entry to the market and the recent expansion of an existing service permitted by the Commission. Among other things, the Commission noted that evidence that is theoretical in nature would have less probative value than evidence based on the facts and circumstances of the case and concluded that the information to be gathered on remand might lead the Commission to make a more informed, just, and reasonable decision on whether to grant the application. In December 2010, however, the Commission granted the intervenors' motions for reconsideration,

reversed its own remand order, and found the ALJ's initial conclusions to have been supported by the existing record.

¶ 6 More particularly, the Commission agreed with the intervenors that the remand objectives might be difficult to achieve as a practical matter and that the order called for an investigation beyond the powers of the ALJ. Instead, the Commission proceeded on the basis of the existing record, emphasizing its deference to the ALJ's evaluation of the expert witness testimony. The Commission expressly found that the public convenience and necessity did not require it to accept the risk of the undesirable consequences identified by these witnesses and the ALJ, emphasizing its understanding that a substantial possibility of destructive competition and other negative public interest outcomes would be sufficient to satisfy the statutory standard for denial. Agreeing with what it characterized as the ALJ's finding of a substantial probability that both the adjustment process and the outcomes associated with allowing Mile High's cabs to enter the market would be detrimental to the public interest, the Commission accepted the ALJ's recommendation and denied Mile High's application.

¶ 7 On judicial review pursuant to section 40–6–115, C.R.S. (2012), the district court affirmed, finding that the Commission regularly pursued its authority; that the Commission's decision to deny Mile High a certificate was just and reasonable; that the Commission's conclusions were in accordance with the evidence; and that the Commission's ultimate decision to deny was supported by substantial evidence. With regard to the question whether the Commission regularly pursued its authority, in particular, the district court found that the Commission applied the appropriate legislative standard in finding that the intervenors sustained their burden by demonstrating a substantial probability that issuance would be detrimental to the public interest.

¶ 8 Pursuant to section 40–6–115(5), Mile High filed for appellate review directly with this court.

## II.

¶ 9 "Taxicab service" refers to a particular kind of motor vehicle passenger transportation that may not be afforded without first obtaining from the Public Utilities Commission a certificate declaring that the present or future public convenience and necessity requires such operation. *See* §§ 40–10.1–101(19), 40–10.1–201, C.R.S. (2012). In 2008 the specific statutory requirements for granting a certificate to operate a taxicab service were substantially amended. *See* House Bill 08–1227, 2008 Colo. Sess. Laws 1801–02 (§ 40–10–105, C.R.S. (2008)).[1] Although a distinction had previously been drawn be-

---

1. Following the 2008 amendments, subsection 40–10–105(2) read in full:

(2) (a) The granting of a certificate of public convenience and necessity to operate a motor vehicle for hire as a taxicab within and between counties with a population of less than seventy thousand, based on the federal census conducted in 2000, shall be governed by the doctrine of regulated monopoly.

(b) (I) Except as otherwise provided in subparagraph (II) of this paragraph (b), the granting of a certificate of public convenience and necessity to operate a motor vehicle for hire as a taxicab service within and between counties with a population of seventy thousand or greater, based on the federal census conducted in 2000, shall not be deemed to be an exclusive grant or monopoly, and the doctrine of regulated competition shall prevail.

(II) In an application for a certificate of public convenience and necessity to provide taxicab service within and between the counties of Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, El Paso, and Jefferson:

(A) The applicant shall have the initial burden of proving that it is operationally and financially fit to provide the proposed service. The applicant shall not be required to prove the inadequacy of existing taxicab service, if any, within the applicant's proposed geographic area of operation.

(B) If the applicant sustains its initial burden of proof as set forth in sub-subparagraph (A) of this subparagraph (II), there shall be a rebuttable presumption of public need for the service, and the party or parties opposing the application shall bear the burden to prove that the public convenience and necessity does not require granting the application and that the issuance of the certificate would be detrimental to the public interest.

In 2011, the legislature reorganized the provisions of Title 40 applicable to motor carriers. House Bill 11–1198, 2011 Colo. Sess. Laws 406–07. The requirements for granting a certificate to operate a taxicab service are now found at section 40–10.1–203, C.R.S. (2012).

tween applications by services proposing to operate in counties with a population of less than 60,000 and those proposing to operate in counties with a population greater than 60,000, *see* Senate Bill 94–113, 1994 Colo. Sess. Laws 1996 (§ 40–10–105, C.R.S. (2007)), the 2008 amendments increased the population demarcation to 70,000 and singled out seven named counties with populations greater than 70,000, including Denver, for special treatment in the application process.

¶ 10 Unlike applications for counties with populations of less than 70,000, which were expressly to be "governed by the doctrine of regulated monopoly," *see* § 40–10–105(2)(a), C.R.S. (2008), certificates for counties with populations greater than 70,000 were not to be deemed "an exclusive grant or monopoly, and the doctrine of regulated competition [was to] prevail," *see* § 105(2)(b)(I). With regard to applications for Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, El Paso, and Jefferson Counties, however, subsection (2)(b) further provided that the applicant was to "have the initial burden of proving that it [was] operationally and financially fit," but that it would expressly "not be required to prove the inadequacy of the existing taxicab service, if any, within the applicant's proposed geographic area of operation." *See* § 105(2)(b)(II)(A). Rather, if the applicant sustained its initial burden of proving its fitness, "a rebuttable presumption of public need for the service" would then arise, and those "opposing the application [would] bear the burden to prove that the public convenience and necessity [did] not require granting the application and that the issuance of the certificate would be detrimental to the public interest." *See* § 105(2)(b)(II)(B).[2]

▮ ¶ 11 Whatever might be the precise limits and applicability of the doctrine of regulated competition, as well as the precise meanings of and relationships among the terms "public interest," "public need," and "public convenience and necessity," there is no dispute that once an applicant for service in Denver had proved its fitness, the Com-

mission was statutorily obligated to issue a certificate *unless* those opposing the application were able to prove *both* that the public convenience and necessity did not require its issuance *and* that issuance of the certificate would be detrimental to the public interest. Similarly, there is no dispute that the term "prove" as used in this statute must be understood to require proof by a preponderance of the evidence. The Commission asserts, simply, that proof of a particular eventuality by a preponderance of the evidence is accomplished by demonstrating a "substantial possibility" that the eventuality will occur.

▮ ¶ 12 By a combination of constitutional and statutory authority, the Public Utilities Commission is the agency charged with administration of the public utilities laws, and we have often noted the limited review to which its authority to grant or deny permits is subject. *See, e.g., Eddie's Leaf Spring Shop & Towing LLC v. Pub. Utils. Comm'n,* 218 P.3d 326, 330 (Colo.2009) (citing § 40–6–115, C.R.S. (2009)); *Silverado Commc'n Corp. v. Pub Utils. Comm'n,* 893 P.2d 1316, 1319 (Colo.1995) (citing Colo. Const. art. XXV). Similarly, we have often commented on the deference to which its interpretations of public utilities statutes are entitled. *See, e.g., Eddie's Leaf,* 218 P.3d at 330. While we have never found it necessary to specify whether by "deference" we have intended merely a respectful consideration of the Commission's views or, more in the vein of modern federal administrative jurisprudence, an actual acceptance of its interpretations under specified circumstances, *see generally* John H. Reese, "Bursting the Chevron Bubble: Clarifying the Scope of Judicial Review in Troubled Times," 73 Fordham L. Rev. 1103 (2004), we have long held that courts are not bound by agency interpretations misconstruing or misapplying the law and that interpretations actually contravening legislative intent are not entitled to deference. *See Huddleston v. Bd. of Equalization of Montezuma Cnty.,* 31 P.3d 155, 160 (Colo.2001) (citing *Huddleston v. Grand Cnty. Bd. of*

---

2. Subsection 105(2)(b)(II)(B) was subsequently amended again in 2009, replacing "and" with "or" where it had previously read, "and that the issuance of the certificate would be detrimental to the public interest." Senate Bill 09–294, 2009 Colo. Sess. Laws 2428.

*Equalization*, 913 P.2d 15, 17 (Colo.1996) and *Tivolino Teller House, Inc. v. Fagan*, 926 P.2d 1208, 1215 (Colo.1996)). With respect to the Public Utilities Commission in particular, we have made clear that we will set aside actions or interpretations that are clearly erroneous, arbitrary, in excess of the Commission's authority, or not in accordance with the law. *CF & I Steel, L.P. v. PUC*, 949 P.2d 577, 584 (Colo.1997). It remains the obligation of the judiciary ultimately to interpret public utilities statutes, and Commission interpretations of unambiguous statutes, at the very least, are therefore entitled to no deference whatsoever.

¶ 13 Imprecise as they may be, there are nevertheless well-accepted formulae for describing the degree of certainty required in specific contexts to prove that something has occurred or will occur in the future. Although arguably nothing short of logical tautology can rightly be characterized as certain, for various purposes in the criminal context, due process demands that proof be "beyond a reasonable doubt," *Speiser v. Randall*, 357 U.S. 513, 525–26, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); in both criminal and civil contexts, particular findings of great importance demand proof by the less strict but nevertheless heightened burden characterized as proof by "clear and convincing evidence," *e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (applying to termination of parental rights); and unless otherwise specified, the accepted burden of persuasion in the civil context is proof "by a preponderance of the evidence." *Page v. Clark*, 197 Colo. 306, 318, 592 P.2d 792, 800 (1979); *see also In re Winship*, 397 U.S. 358, 371–72, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring); *see generally* 2 Kenneth S. Broun, McCormick on Evidence § 339 (6th ed.2009). As in civil cases generally, there is no dispute that the legislative allocation of the burdens of proof in section 40–10–105(2)(b) requires proof by a preponderance of the evidence.

¶ 14 As the phrase itself signifies, proof of a circumstance or occurrence "by a preponderance of the evidence" demands that in order for this circumstance or occurrence to be considered established, evidence of it must preponderate over, or outweigh, the evidence to the contrary. Without imputing any technical meaning to the term "probable" or implying any manner of mathematical calculation, the widely accepted formula for expressing this burden of proof, or persuasion, is that the matter to be proved must be found to be more probable than not. *See Page*, 197 Colo. at 318, 592 P.2d at 800; *In re Winship*, 397 U.S. at 371–72, 90 S.Ct. 1068; McCormick on Evidence § 339, at 484–86. The legislative allocation of the burden of proof in section 40–10–105(2)(b)(II), therefore, prescribes that once an applicant has shown it to be more probable than not that it is operationally and financially fit to provide the service, that applicant is entitled to a Certificate of Public Convenience and Necessity unless those opposing issuance demonstrate that it is nevertheless more probable than not that the public convenience and necessity do not require granting the application and that it is more probable than not that doing so will actually be detrimental to the public interest.

¶ 15 The notion of a "substantial probability" or "substantial possibility" does not convey the same meaning. In related contexts this court and the Supreme Court have each used the term "reasonable probability" to refer to a likelihood of occurrence which, although not insignificant, nevertheless need not rise to the level of a preponderance of the evidence. *Strickler v. Greene*, 527 U.S. 263, 297–98, 300, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Krutsinger v. People*, 219 P.3d 1054, 1063 (Colo.2009). Although the term "substantial probability" has at times been used to refer to a likelihood greater than a "reasonable likelihood," *see Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 14, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (requiring "substantial probability" rather than mere "reasonable likelihood" that defendant's right to fair trial would be prejudiced by publicity that closure would prevent), we can find no indication that it has been equated with a preponderance of the evidence or the formula, "more probable than not," *cf. In re "Agent Orange" Product Liability Litigation*, 100 F.R.D. 718, 726 (E.D.N.Y.1983), *aff'd*, 818 F.2d 145 (2d Cir.1987), *cert. denied sub nom. Fraticelli v. Dow Chemical Co.*,

484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988) ("[T]he proper standard is whether there is a substantial probability—that is less than a preponderance but more than a mere possibility—that if damages are awarded, the claims of earlier litigants would exhaust the defendants' assets."). On the rare occasion in which the term "substantial probability" has appeared in our statutes with regard to a required showing, we have both emphasized its lack of preciseness and implicitly distinguished it from the preponderance burden of proof by requiring that the substantial probability of the particular occurrence itself be proved by a preponderance of the evidence. *See City of Aurora v. ACJ Partnership*, 209 P.3d 1076, 1083–84 (Colo.2009) (finding applicant had met her burden to show by "preponderance of the evidence" that there was a "substantial probability" she should and would complete her appropriation).

¶ 16 To make even less clear the standard of proof applied in this case, the Commission used the terms "substantial probability" and "substantial possibility" interchangeably, equating a "substantial possibility" with a "preponderance of the evidence," in reliance on a prior holding of this court to the effect that a "substantial opportunity" to discriminate or compete unfairly would be adequate grounds for denying a permit of transfer from contract to common carrier. *Mobile Pre–Mix Transit, Inc. v. Pub. Utils. Comm'n*, 618 P.2d 663, 666 (Colo.1980). In addition to the clear difference between avoiding the "possibility" of unfair competition in *Mobile Pre–Mix* and predicting the effect of a new entrant to the market in the instant case, our holding in *Mobile Pre–Mix* reflects our own formulation of an appropriate standard for effectuating a legislative proscription against discrimination and unfair competition rather than an interpretation of a specific, legislatively prescribed burden of proof. Moreover, while we have not always rigidly adhered to the distinction, the United States Supreme Court clearly intends a greater likelihood of or confidence in an occurrence when it refers to a "reasonable probability," than when it refers to a "reasonable possibility," leaving the latter even further removed than the former from a preponderance of the evidence. *See Krut-*

*singer*, 219 P.3d at 1060 n.3 (discussing *Strickler*, 527 U.S. 263, 119 S.Ct. 1936).

¶ 17 Whether or not it was required, or even warranted, the Commission deferred to the ALJ's evaluation of expert testimony concerning economic models and predictions about market conditions and future behavior, rather than reevaluating that evidence itself. Although the Commission characterized the ALJ as having found a "substantial probability" that both the adjustment process and outcomes associated with allowing Mile High to enter the market would be detrimental to the public interest, the ALJ's findings were actually expressed in even more ambiguous terms. The ALJ concluded that the intervenors had sustained their burden of proof on the basis of his findings, for example, of "a distinct possibility" of oversupply; of the *"real possibility* of destructive or excessive competition that *could very well* could (sic) have negative market and public interest outcomes" (emphasis added); and that Mile High's entry into the market *"could very well* result in impaired services, higher rates, and ultimately … destructive competition" (emphasis added). In light of the indiscriminate use of these vague and intuitive expressions of confidence or likelihood, even the Commission's occasional use of the term "probable," which might sometimes be taken to intend "more probable than not," was insufficient to clearly manifest an intent to apply a preponderance standard.

¶ 18 Ultimately the Commission concluded, as had the ALJ, that the public convenience and necessity did not require it to accept the risk of the undesirable consequences identified by the intervenors' experts and that a substantial possibility of destructive competition and other negative public interest outcomes was sufficient to satisfy the statutory standard for denial. There can be little doubt that the Commission's assessment of what is and what is not in the public interest in this context, consistent with clear legislative prescription, must be entitled to deference by reviewing courts, but the Commission cannot simply ignore a statutory mandate to the contrary. In light of the legislature's express allocation of burdens in section 40–10–105(2)(b)(II), the pub-

lic was in fact required to accept the risk of these undesirable consequences unless the intervenors proved that it was more probable that issuing the Certificate of Public Convenience and Necessity *was not* required by the public convenience and necessity, and that doing so actually *would be* detrimental to the public interest, than that issuing the certificate *was* required by the public convenience and necessity and *would not be* detrimental to the public interest. In the absence of an ability to find this required level of certainty, or predictability, concerning the public convenience, necessity, and interest, the Commission was statutorily obligated to issue the certificate. The district court therefore erred in finding that the Commission regularly pursued its authority.

## III.

¶ 19 Because the record does not clearly contain the finding statutorily required for a denial of Mile High's application by the Public Utilities Commission—that the parties opposing the application proved by a preponderance of the evidence that the public convenience and necessity did not require granting the application and that the issuance of a certificate would actually be detrimental to the public interest—the judgment of the district court is reversed, and the case is remanded with directions to return the matter to the Public Utilities Commission for further action consistent with this opinion.