22CA0436 Peo v Nardi 10-31-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0436
Pitkin County District Court No. 13CR33
Honorable Christopher G. Seldin, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Peter Bruno Nardi,

Defendant-Appellant.

ORDER AFFIRMED

Division VII
Opinion by JUDGE TOW
Pawar and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 31, 2024

Philip J. Weiser, Attorney General, Frank R. Lawson, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Lucy H. Deakins, Alternate Defense Counsel, Denver, Colorado, for Defendant-
Appellant

¶ 1     Defendant, Peter Bruno Nardi, appeals the postconviction court's order denying his Crim. P. 35(c) motion after an evidentiary hearing.  We affirm.

## I.     Background

¶ 2     According to the evidence at trial, Nardi and J.B. were in a romantic relationship for eight months.  J.B. called 911 and reported that Nardi had physically and sexually assaulted her the night before.  J.B. received a sexual assault examination, which revealed DNA evidence consistent with J.B.'s story.

¶ 3     Nardi was charged with sexual assault, attempted second degree assault, two counts of third degree assault, and false imprisonment.  The prosecution later added a violation of bail bond conditions charge after Nardi missed a court date.

¶ 4     Nardi, who did not qualify as indigent, was initially represented by private defense counsel John P. Van Ness.  Nardi signed a fee agreement providing that Van Ness would represent Nardi in exchange for a $10,000 retainer, $2,500 to be paid on a specific date, and $1,000 to be paid every two weeks starting on a later date.  The agreement, which was secured by a lien on Nardi's

1

car, specified that Van Ness would bill Nardi $250 per hour against the retainer, and expenses greater than $30 were Nardi's responsibility, including expert witness fees.

¶ 5    A few months after Van Ness began representing Nardi, he told Nardi that he would likely need to hire co-counsel for the trial, as well as retain an investigator and expert witnesses.  Nardi could not afford these costs, and Van Ness moved to withdraw from the case.

¶ 6    A few weeks later, before the trial court acted on the withdrawal request, Van Ness and Nardi signed an amended fee agreement.  They agreed that the current bill for legal services, which exceeded the initial retainer, would be satisfied by the money Nardi had already paid in addition to Nardi signing over title to two vehicles.  The amended fee agreement also provided, "In exchange for 70% of any settlement or collected judgment against [J.B.], I agree to provide legal services including defense of your four criminal cases, and prosecution of a civil claim against [J.B.]."  In addition, Nardi and Van Ness agreed that if co-counsel was needed, Van Ness would be responsible for paying them, but Nardi would be

responsible for the likely required expert witness expenses, among other expenses.

¶ 7    Van Ness later enlisted Colleen Scissors as co-counsel.

¶ 8    Approximately two weeks before the jury trial began, Van Ness filed a motion requesting that the trial court order the state to pay for the cost of expert witness fees pursuant to Chief Justice Directive (CJD) 04-04, Appointment of State-Funded Counsel in Criminal Cases and for Contempt of Court, § V(D) (amended July 2024). This CJD gives a trial court discretion to authorize state-paid defense experts if "[t]he defendant is receiving private counsel but becomes indigent during the course of the case, and the court has determined that the defendant lacks sufficient funds to pay for court costs, and that it would be too disruptive to the proceedings to assign the Public Defender or Alternate Defense Counsel to the case." CJD 04-04, § V(D)(1)(c). The motion stated that Nardi had been able to pay Dr. Robert Lantz, a serology expert,[1] to date but that Dr. Lantz's estimated fee for testifying at trial was $7,000, which Nardi was unable to pay.

---

[1] Serology is the study of bodily fluids.

¶ 9      The day before the jury trial began, Nardi filed an affidavit of financial condition, in which he asserted he had been employed for forty hours a week since the end of the previous year but because the ski season had just ended his hours had dropped to twenty per week.  He requested that the state pay for the cost of the expert witness fees at trial.  The same day, the trial court found that Nardi was indigent and was therefore eligible to have the state pay his expert fees pursuant to CJD 04-04, but the court denied the motion without prejudice to renew, noting that Nardi requested an amount much greater than the maximum permitted under CJD 12-03, which at the time set the maximum amount for state-paid expert fees at $1,000.  *See* CJD 12-03, Directive Concerning Court Compensation of Expert Witnesses and Professionals Conducting Mental Health Evaluations, Sanity Evaluations, and Competency Evaluations, § I(D) (effective until July 1, 2015).  Ten days into the trial, after Nardi filed a renewed motion, the trial court ordered the state to pay a total of $2,000 for Dr. Lantz's expert fees, again finding that Nardi was indigent but that it would be too disruptive to appoint a public defender or alternate defense counsel to the

case. Ultimately, Dr. Lantz did not testify on behalf of Nardi at trial because he was unwilling to accept the state rate. No other expert witness testified for Nardi.

¶ 10 The jury convicted Nardi on all counts. The court sentenced him to an indeterminate term of eleven years to life for the sexual assault conviction and three years for the attempted second degree assault conviction in the custody of the Department of Corrections with an additional one-year consecutive sentence on the bail bond violation conviction. (On the remaining convictions, the court imposed jail sentences to run concurrently with the attempted assault sentence.)

¶ 11 Nardi's conviction was affirmed on direct appeal, though the division concluded that the trial court had used an incorrect sentencing range for the sexual assault conviction and remanded the matter for resentencing. *People v. Nardi*, (Colo. App. No. 14CA1643, Mar. 8, 2018) (not published pursuant to C.A.R. 35(e)). After Nardi was resentenced, he filed a timely pro se Crim. P. 35(c) motion, which was later supplemented by appointed counsel.

Following an evidentiary hearing, the postconviction court denied the motion.

¶ 12    Nardi appeals.

## II.    Standard of Review and Applicable Law

¶ 13    A postconviction court's ruling on a Rule 35(c) motion after a hearing presents a mixed question of fact and law. *People v. Sharp*, 2019 COA 133, ¶ 12.  "We defer to the court's findings of fact if they have record support, but we review any legal conclusions de novo." *Id.*  The postconviction court determines the weight and credibility to be given to the testimony of witnesses in a Crim. P. 35(c) hearing. *People v. Hardin*, 2016 COA 175, ¶ 39.

¶ 14    When evaluating most claims of ineffective assistance of trial counsel, we apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Ardolino v. People*, 69 P.3d 73, 76 (Colo. 2003); *People v. Long*, 126 P.3d 284, 286 (Colo. App. 2005).  To prevail on such a claim, a defendant must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced him.  *Strickland*, 466 U.S. at 686.

¶ 15    To establish deficient performance, a defendant must prove that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citation omitted). To establish prejudice, a defendant must show that there is a reasonable probability that, absent the errors, "the result of the proceeding would have been different." *Id.* at 694. A postconviction court may reject an ineffective assistance of counsel claim if the defendant fails to demonstrate either deficient performance or prejudice. *People v. Aguilar*, 2012 COA 181, ¶ 9.

¶ 16    *Strickland*'s familiar standard, however, does not always govern an ineffective assistance of counsel claim. In *United States v. Cronic*, 466 U.S. 648, 658-61 (1984), the Supreme Court identified three situations in which a defendant can prove ineffective assistance of counsel without having to establish prejudice: (1) there is a complete denial of counsel; (2) "counsel

7

entirely fails to subject the prosecution's case to meaningful adversarial testing"; or (3) "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate." *See also Bell v. Cone*, 535 U.S. 685, 695-96 (2002).

¶ 17      Another scenario in which prejudice is presumed is when a defendant's counsel labored under an actual conflict of interest. *West v. People*, 2015 CO 5, ¶ 57; *see also Cronic*, 466 U.S. at 662 n.31 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 348-49 (1980)). An actual conflict is one that adversely affected counsel's performance. *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002).

> [T]o show an adverse effect, a defendant must (1) identify a plausible alternative defense strategy or tactic that counsel could have pursued, (2) show that the alternative strategy or tactic was objectively reasonable under the facts known to counsel at the time of the strategic decision, and (3) establish that counsel's failure to pursue the strategy or tactic was linked to the conflict.

*West*, ¶ 57.

### III. Analysis

¶ 18    Nardi contends that he established his ineffective assistance claim under all three theories — an actual conflict of interest under *West*, a prejudicial substandard performance under *Strickland*, and the failure to subject the prosecution's case to meaningful adversarial testing under *Cronic*. We address and reject each claim.

#### A.    *West*: Actual Conflict of Interest

¶ 19    Nardi claims that the contingency fee agreement created a conflict of interest for his counsel. Specifically, he argues that under the amended fee agreement, Van Ness would only get paid if Nardi was acquitted and then recovered a judgment against J.B. in a civil matter Nardi planned to file based on her purportedly false allegations. Because Van Ness's ability to get paid relied entirely on Nardi's exoneration, he argues, his counsel could not take any steps — or advise Nardi to take any action — that might result in a conviction even for a lesser offense. We discern no actual conflict of interest.

¶ 20    As a threshold matter, we note that the postconviction court found that Scissors, not Van Ness, was lead trial counsel. Nardi does not challenge that finding. Recall that Van Ness was

9

responsible for paying Scissors. There is nothing in the record to suggest that *Scissors* would not get paid unless Nardi recovered a civil judgment against J.B. Indeed, at the postconviction hearing, Scissors testified that she did not learn of the contingent fee agreement between Van Ness and Nardi until the commencement of the postconviction proceedings. Thus, because Scissors was the captain of the ship regarding trial strategies (including the decision whether to tender a lesser included offense instruction) and she did not labor under any conflict flowing from Nardi's fee agreement *with Van Ness*, Nardi's claim that the failure to tender a lesser included offense instruction ran afoul of *West* fails.

¶ 21 As to Nardi's claim that Van Ness labored under an actual conflict, we follow the postconviction court's lead and assume, without deciding, that the amended fee agreement created a conflict of interest for Van Ness. We therefore turn to whether Nardi showed an adverse effect resulting from that purported conflict.

¶ 22 Nardi identifies what he asserts are two plausible alternative defense strategies that Van Ness could have, but did not, pursue: (1) seeking a plea deal or conviction on lesser charges and

(2) invoking Nardi's indigency earlier to facilitate either Van Ness's replacement with a public defender or state funds to pay for an expert witness.

¶ 23    The postconviction court found that it was not objectively reasonable for Van Ness to initiate plea negotiations because Nardi steadfastly maintained his innocence and even provided statements to a newspaper proclaiming as much.

¶ 24    Relying on *Carmichael v. People*, 206 P.3d 800, 806 (Colo. 2009), Nardi argues that his innocence claims do not relieve his counsel from the obligation to seek a plea agreement.  But Nardi ignores significant differences between *Carmichael* and this case. There, notwithstanding the defendant's protestation of innocence, the defendant *instructed* his counsel to seek a plea agreement, and his counsel and the prosecution were actively negotiating. *Carmichael*, 206 P.3d at 807.  To the contrary, here, no plea offer was extended, and there is no evidence that Nardi ever instructed Van Ness to pursue a plea offer.

¶ 25    Thus, *Carmichael* does not stand for the proposition to which Nardi's argument would inexorably lead: that an attorney must

11

always solicit a plea bargain or offer instructions on a lesser included offense. Indeed, as the postconviction court noted, the law in Colorado appears to be the opposite — defense counsel has no duty to initiate plea negotiations when the defendant adamantly maintains his innocence. *See People v. Sherman,* 172 P.3d 911, 913 (Colo. App. 2006).

¶ 26    The record supports the postconviction court's finding that, under the circumstances, counsel's decision to forego pursuing a plea bargain was objectively reasonable. Further, we note that the postconviction court did not explicitly address Nardi's argument regarding Van Ness failing to offer a lesser included offense instruction (most likely because it had concluded that Scissors, not Van Ness, was responsible for the decision not to do so). But even assuming it was Van Ness's decision, the logic underpinning the court's resolution of the plea bargain issue — that pursuing that path was objectively unreasonable in light of Nardi's steadfast claims of innocence — applies equally to the pursuit of a lesser included offense conviction.

¶ 27    As to Van Ness's efforts to invoke Nardi's indigency, the postconviction court found that Van Ness pursued experts and sought state funds to obtain an expert at trial.  The court further found that Nardi was not indigent until right before trial, implicitly finding that it would not have been reasonable to try to replace Van Ness with a public defender or obtain a state-funded expert before that point.

¶ 28    Because the record supports the postconviction court's factual findings, we will not disturb them.  And based on those findings, we see no basis to disturb the postconviction court's determination that any conflict that might have flowed from the fee agreement did not have an adverse effect on the representation.  Thus, Nardi's *West* claim fails.

B.    *Strickland*: Prejudicial Subpar Performance

¶ 29    In the alternative, Nardi contends that, even if there was no actual conflict of interest, Van Ness and Scissors provided ineffective assistance of counsel under the *Strickland* standard in two ways: (1) the fee agreement fell below the standard of conduct,

13

and (2) counsel failed to present expert testimony in serology and DNA. Again, we disagree.

### 1. The Fee Agreement

¶ 30 Nardi argues that, because the fee agreement was in derogation of Van Ness's ethical obligations, it necessarily fell below the standard of conduct. Even assuming this were true, however, Nardi would need to establish prejudice to satisfy the *Strickland* standard. But other than his argument that the agreement created an actual conflict — which we have rejected — Nardi does not explain how there is a reasonable probability that, but for the existence of that agreement, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 695. Thus, Nardi has failed to establish prejudice on this claim.

¶ 31 Further, Nardi contends that the nature and effect of the fee agreement caused him to be "prejudiced by the lack of effective assistance of counsel because he was not able to make fully informed decisions." As we noted above, however, this conclusory contention is belied by the fact that there was no decision to make because no plea deal was offered. *See People v. Villanueva*, 2016

COA 70, ¶ 68 (a conclusory allegation of prejudice is insufficient under *Strickland*); *cf. People v. Sudduth*, 991 P.2d 315, 317 (Colo. App. 1999) (concluding that the record belied the defendant's allegation that he was insufficiently advised and that the trial court properly rejected the claim without a hearing).

¶ 32    Thus, the postconviction court did not err by denying this claim.

## 2.    Experts

¶ 33    The postconviction court concluded that the decision not to present testimony from a DNA expert at trial was not deficient performance. The court also found that defense counsel consulted with a serology expert. And the court concluded that Nardi was not prejudiced.

¶ 34    Defense counsel has final authority to make decisions that are regarded as strategic or tactical in nature. *Arko v. People*, 183 P.3d 555, 558 (Colo. 2008). Such decisions include whether to consult or retain an expert. *People v. Smith*, 2022 COA 56, ¶ 30, *rev'd,* 2024 CO 3. And the postconviction court found, with record support, that the crux of the defense was the presence or absence

15

of saliva, not DNA. Thus, prioritizing a serology expert over a DNA expert was a reasonable strategic choice.

¶ 35    As to the serology expert, Nardi contends that Van Ness was unwilling to pay for Dr. Lantz's services out of pocket or to advance funds. We agree with the postconviction court that this was not ineffective assistance of counsel. And Nardi does not cite any authority, nor are we aware of any, suggesting that a private defense attorney must pay for an expert witness when the defendant cannot.

¶ 36    Nardi next contends that Van Ness failed to withdraw from the case or timely request state funds to pay for a serology expert, even though Van Ness had information that Nardi would be unable to pay for the expert himself. Again, the district court found, with record support, that Nardi did not become indigent until shortly before trial and that Van Ness requested that the state pay for the serology expert at that time.

¶ 37    Nardi next contends that even after filing the motion requesting a state-funded expert, Van Ness failed to request a hearing on an expedited basis in order to find an available expert to

16

work for the amount authorized by the court.  And he contends that Phillip Danielson, an expert in "forensic biology DNA," had relevant expertise and was willing to work for the state rate.

¶ 38 Even assuming, without deciding, that this was ineffective assistance of counsel, Nardi does not show how he was prejudiced. Nardi contends that Dr. Danielson would have testified that there was DNA from at least one male other than Nardi in the areas that J.B. said Nardi had touched or spit on her: J.B.'s eyelid, neck, and genitalia.  At the postconviction hearing Dr. Danielson testified that the vaginal swab had DNA from only one male on it, and this DNA profile matched Nardi's.  And Dr. Danielson testified that it was not uncommon to find people's DNA on exposed parts of the body, such as the neck and eyelids.  Not only is part of Nardi's allegation belied by the record, but Nardi does not explain how admitting testimony about the presence of DNA from someone other than Nardi on J.B.'s neck and eyelids — both exposed body parts — would have changed the outcome of the trial.  *See People v. Phipps*, 2016 COA 190M, ¶ 36; *People v. McDowell*, 219 P.3d 332, 340 (Colo. App. 2009); *see also Villanueva*, ¶ 67 ("At this stage in the proceedings, [the

17

defendant] must do more than simply allege that other evidence could have aided his defense; he must identify the evidence and demonstrate that it would have advanced his defense.").

¶ 39    Thus, the postconviction court did not err by denying this claim.

### C.    *Cronic*: Meaningful Adversarial Testing

¶ 40    Finally, relying on *Cronic*, Nardi contends that prejudice should be presumed because counsel did not subject the prosecution's case to meaningful adversarial testing. In particular, Nardi argues that counsel failed to (1) hire an investigator; (2) file a CRE 404(b) motion (or warn co-counsel about the lack of filing one); (3) request a continuance when Nardi was sick at the time he was supposed to testify; and (4) understand the consequences of not getting an expert (and not getting an expert to testify). We disagree.

¶ 41    As discussed, the *Cronic* presumption applies when counsel completely fails to subject the prosecution's case to meaningful adversarial testing, thereby making the adversary process itself presumptively unreliable. *Cronic*, 466 U.S. at 659; *see also Krutsinger v. People*, 219 P.3d 1054, 1061 (Colo. 2009) (preventing

18

defendant from presenting evidence caused a failure of the adversarial process); *Bell*, 535 U.S. at 697 (Under *Cronic*, "the attorney's failure [to test the prosecutor's case] must be complete."). In contrast, a claim relying on trial counsel's specific errors must be reviewed under *Strickland*'s two-prong test. *Cronic*, 466 U.S. at 666 n.41.

¶ 42 Nardi's argument is not that Van Ness failed to oppose the prosecution's case throughout the case; instead, he challenges specific instances of counsels' allegedly deficient performance. *See Bell*, 535 U.S. at 697. Such claims are governed by *Strickland* not *Cronic*. *Cronic*, 466 U.S. at 666 n.41. Indeed, in its oral ruling, the postconviction court correctly noted that the thrust of Nardi's claim was properly characterized as a *Strickland* claim.

¶ 43 To the extent Nardi attempts to assert a *Cronic* claim, there is no basis on this record to conclude that either Van Ness or Scissors entirely failed to subject the prosecution's case to meaningful adversarial testing. And to the extent his claim actually falls under the *Strickland* rubric, Nardi is required to establish prejudice. But his assertions of how these specific purported failings by counsel

prejudiced him are conclusory and insufficient. *See Villanueva,*
¶ 68. Thus, the postconviction court did not err by denying this
claim.

## IV. Disposition

¶ 44    The order is affirmed.

JUDGE PAWAR and JUDGE SCHUTZ concur.