22CA1445 Peo v Mathews 11-13-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1445
Elbert County District Court No. 18CR18
Honorable Gary M. Kramer, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

David Scott Mathews,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Brown and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 13, 2025

---

Philip J. Weiser, Attorney General, Josiah Beamish, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John P. Finnegan, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, David Scott Mathews, appeals his convictions for second degree assault and obstruction of telephone service. We affirm.

## I.    Background

¶ 2    The night of February 5, 2018, Elbert County 911 operators received a call from Mathews, who said he needed to leave his home and needed a "buffer" but that nothing was going on; he ultimately declined assistance. The dispatch operator returned Mathews' call, and he repeated that deputies were not needed. Given the unusual nature of the calls, Deputy Michael Saunders went to the home, arriving approximately twenty minutes after the first 911 call. When he arrived, Mathews was on the porch. As Saunders approached, Mathews told Saunders he was "no longer needed" and apologized for calling. But Saunders noticed that Mathews was "sweating" and saw what seemed to be blood and cuts on his hands. Fearing that an altercation had occurred, Saunders asked if anyone else was home. Mathews said his mother, Mary Mathews,[1]

---

[1] Because of their shared surname, we respectfully refer to Mary Mathews by her first name in this opinion.

with whom he was living at the time, was inside in the bathtub. Saunders asked if he could check on her, and Mathews agreed.

¶ 3    Saunders saw "water and blood on the floor leading down the hallway." Saunders asked whose blood it was, and Mathews said it was Mary's. Saunders testified that, as they entered the home, Mathews said, "Just shoot me. Kill me. . . . Take me to jail. Kill me. I deserve it. I hit my mother. Take me to jail." Mathews was reportedly calm during this interaction, and Saunders handcuffed him and sat him in a chair in the kitchen. Mary then came out "covered in blood" and holding a towel on her head.

¶ 4    Saunders testified that Mary, who was sixty-three, appeared "pretty badly" beaten and had a "[four]-inch gash" on her head, she had a pretty good gash to her nose," her eyes were "swelling up," and she was "bleeding rather profusely."[2] Saunders testified that Mary said Mathews had "hit" her and "smashed her head on a hardwood floor over and over," and Mary believed that Mathews potentially "snapped" and "may have been drinking that night."

---

[2] Medical treatment revealed that Mary suffered a "deep" laceration above her left eye, soft tissue swelling around her eyes and left cheek, factures to both nasal bones, and a piece of nasal bone "displaced" on the left side.

¶ 5    On cross-examination, Saunders testified that Mary appeared unafraid and calm and did not want to press charges against Mathews, and Mathews did not appear intoxicated. Deputies later learned that Mary recorded audio of the altercation on her phone, which we discuss in greater detail below. Because Mary died of natural causes before trial, her statements were offered at trial through other witnesses and the recording.

¶ 6    Mathews was charged with (1) attempt to commit first degree murder, (2) first degree assault, and (3) obstruction of telephone service.[3] The defense's theory at trial was that Mathews assaulted Mary but that the evidence only supported second degree assault committed under a "sudden heat of passion." The defense argued that, after decades of bottling up repressed trauma because Mary allegedly abused him as a child, Mathews "snapped" when the two began arguing that night.[4] But the defense argued Mathews never

---

[3] The obstruction of telephone service charge was based on Mathews' statements in the audio recording indicating that he was preventing Mary from using her phone.

[4] In the recording, Mathews accused Mary of sexually abusing him. Whether Mary abused him was disputed, but this was not a focus at trial.

intended to kill Mary, that her injuries largely resulted from him punching her, and he did not hit her head on the floor repeatedly.

¶ 7    The jury found Mathews guilty of (1) second degree assault but did not find that he acted upon a provoked and sudden heat of passion, and (2) obstruction of telephone service. The court also added three habitual criminal sentence enhancers for Mathews' prior felony convictions, sentenced him to serve twenty-four years in the custody of the Colorado Department of Corrections, and ordered him to pay $2,998 in restitution. This appeal followed.

## II.    Issues on Appeal

¶ 8    Mathews raises four issues on appeal. First, he contends that the district court erred by admitting Mary's statements to Saunders at the home because they were testimonial hearsay that violated his confrontation rights.

¶ 9    Next, Mathews argues that the court erred by refusing to admit, under CRE 807, Mary's statements to a defense investigator made over a year after the incident. He argues that the statements demonstrated sufficient circumstantial guarantees of trustworthiness to be admitted, and the court violated his right to present a complete defense by excluding them.

4

¶ 10    Third, Mathews contends that the court erred by allowing the jury unfettered access to the audio recording of the assault during its deliberations.  He argues the recording was a testimonial exhibit, and providing the recording to the jury allowed it to give the recording undue weight.

¶ 11    Each of these claims was preserved for appeal, *see People v. Tallent,* 2021 CO 68, ¶ 12, and Mathews argues that each alleged error warrants reversal.  His fourth argument is that, even if any of these errors does not merit reversal in isolation, the combined alleged errors constitute cumulative error that deprived Mathews of a fair trial and merit reversal.

¶ 12    The prosecution counters that any presumed error would be harmless but also contends that there was insufficient evidence to support a heat of passion theory and that the court's instruction on this issue was improper.  Because the court did not err, we need not address this contention.  We note, however, that the prosecution did not preserve this issue for appeal and conceded in its briefing that "this issue was never litigated."  *See Hagos v. People,* 2012 CO 63, ¶ 14.

### A. Mary's Hearsay Statements to Saunders

¶ 13    Because Mary died before trial, the prosecution sought to admit her statements to Saunders through him, contending that the statements were admissible under CRE 803(2) and 803(3) as excited utterances and statements of then existing mental, emotional, and physical conditions. The prosecution also argued that the statements were nontestimonial because they were part of Saunders' efforts to address an ongoing emergency and were therefore admissible without violating the Confrontation Clause.

¶ 14    The prosecution's pretrial notice detailed that it sought to elicit from Saunders Mary's statements that

> [h]er son David had hit her, then smashed her head on the hardwood floors an unknown amount of times. He stated nothing to her as he smashed her head onto the floor, over and over. She was not sure why he "snapped" but he did. He was drinking tonight, "maybe that's why."

¶ 15    Mathews objected to this testimony, arguing that the statements were testimonial and would violate the Confrontation Clause if admitted because any emergency had ended and Saunders was investigating the incident. He also argued they were unreliable as Saunders' paraphrased statements (rather than

6

Mary's statements) and that they were not excited utterances or statements concerning a then existing condition.

¶ 16 In a motions hearing, the court found that the statements were nontestimonial responses to Saunders' concerns about Mary's medical condition. It found credible Saunders' testimony during the hearing that when he arrived at the home, he did not know what was going on inside, he saw Mathews sweating with blood on his hands, there was a lot of blood on the floor, and Mathews told Saunders to shoot him and take him to jail. So Saunders was concerned that Mary could be seriously injured or dead.

¶ 17 Further, Saunders testified that he was "stunned" by Mary's condition when she emerged and asked what had happened before she made the challenged statements. As such, the court found that Saunders' primary purpose in questioning Mary was "to render medical care." It also found that the ongoing emergency was not mitigated by the fact that Mathews was handcuffed and that Saunders credibly testified that he believed Mary was "in shock and in pain." As a result, the statements were nontestimonial.

¶ 18 The court also found that the statements were inadmissible under CRE 803(3) (then existing mental, emotional, or physical

condition) but admissible under CRE 803(2) (excited utterance) because the totality of the circumstances — the severity of Mary's injuries, her "agitated emotional state," and the brief time between the injuries and the statements — supported that they were excited utterances. Further, the assault was "sufficiently startling" to prevent reflective thought, particularly because Mary was still suffering from her injuries. Because CRE 803(2) supported their admission, Mary's statements had inherent indicia of reliability and were admissible, and Saunders could share them at trial.

### 1.    Standard of Review and Applicable Law

¶ 19    "We review de novo whether the admission of evidence violates a defendant's confrontation right," *People v. Garcia*, 2021 CO 7, ¶ 6, and we review confrontation claims for constitutional harmless error, *Nicholls v. People*, 2017 CO 71, ¶ 17. The Sixth Amendment to the United States Constitution, and article II, section sixteen of the Colorado Constitution, give every criminal defendant the right to "be confronted with the witnesses against him." U.S. Const. amend. VI; Colo. Const. art. II, § 16; *see also Garcia*, ¶ 7 n.2 (explaining that the state and federal Confrontation Clauses "provide equivalent protections and that the analysis under each is

8

the same"). But testimonial statements only implicate the Confrontation Clause if they are made by witnesses who are unavailable at trial and whom the defendant did not have a prior opportunity to cross-examine. *See Garcia*, ¶ 8.

¶ 20 To determine if a statement is testimonial, courts must determine "whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of [procuring the statement] was to 'creat[e] an out-of-court substitute for trial testimony.'" *Id.* at ¶ 9 (alterations in original) (quoting *Ohio v. Clark*, 576 U.S. 237, 245 (2015)). And the United States Supreme Court has explained that "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Michigan v. Bryant*, 562 U.S. 344, 360 (2011). Courts must also look to "the statement's primary purpose when it is made, not its primary purpose when it is introduced at trial." *Garcia*, ¶ 10.

¶ 21 Even if a hearsay statement is nontestimonial and does not implicate the Confrontation Clause, it must still be admissible

pursuant to a specific hearsay exception. *Nicholls*, ¶ 16. We review

a district court's evidentiary rulings on hearsay statements "for

abuse of discretion. A trial court abuses its discretion only when its

ruling is manifestly arbitrary, unreasonable, or unfair." *Id.* at ¶ 17.

We also review evidentiary rulings for nonconstitutional harmless

error and will reverse an erroneous evidentiary ruling only if it

"affects the accused's substantial rights." *Id.*

¶ 22    CRE 803(2) provides that excited utterances, "statement[s]

relating to a startling event or condition made while the declarant

was under the stress of excitement caused by the event or

condition," are not excluded under CRE 802.

> A hearsay statement is admissible as an
> excited utterance if its proponent shows (1) the
> occurrence or event was sufficiently startling
> to render inoperative the normal reflective
> thought processes of an observer; (2) the
> declarant's statement was a spontaneous
> reaction to the event; and (3) direct or
> circumstantial evidence supports an inference
> that the declarant had the opportunity to
> observe the startling event.

*People v. King*, 121 P.3d 234, 237-38 (Colo. App. 2005). District

courts are "afforded wide discretion in determining whether a

statement is admissible under the excited utterance exception to the hearsay rule." *Id.* at 238.

## 2. Application

¶ 23 The transcript of the audio recording from Mary's phone indicates that once Mary emerged from the hallway, Saunders asked her to sit down. After inquiring about her age, he asked, "Do you want to press charges on your son?" Following a few garbled exchanges, Saunders asked, "[W]here did this happen . . . ?" He also testified during the motions hearing that he recalled telling Mary he would call her an ambulance and asking her how she got hurt, what happened, and if she was okay before she made the challenged statements. According to Saunders, Mary seemed "stunned and injured" and was potentially in shock but did not show "emotional distress." Saunders also testified that Mary said she did not need an ambulance, and she did not want her son to go to jail. He testified that the conversation with Mary lasted "about five minutes."

### a. Testimonial Versus Nontestimonial Statements

¶ 24 Under the totality of the circumstances, Saunders' questioning was not intended to generate out-of-court statements that could

11

serve as a substitute for trial testimony. *See Garcia*, ¶ 9. Like the district court, we conclude that Saunders' primary purpose was to address an ongoing emergency, and, viewed objectively, reasonable participants in Mary and Saunders' positions would have believed the questioning was for this purpose. *See Bryant*, 562 U.S. at 360.

¶ 25 As Mathews points out on appeal, the emergency here is not quite like the ongoing emergency in *Bryant*, "where an armed shooter, whose motive for and location after the shooting were unknown, had mortally wounded [an individual] within a few blocks and a few minutes of the location where the police found [the individual]." *Id.* at 374. Mathews contends that the situation here is more akin to *Hammon v. Indiana*, the companion case to *Davis v. Washington*, both of which were published as *Davis v. Washington*, 547 U.S. 813 (2006), where the Court found a domestic abuse victim's statements to police testimonial because when police arrived and began questioning, "[t]here was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything . . . and there was no immediate threat to [the victim]." *Id.* at 829-30 (citations omitted). But as the Court pointed out in *Bryant*,

12

"whether an emergency exists and is ongoing is a highly context-dependent inquiry." 562 U.S. at 363.

¶ 26 Here, Saunders' five-minute conversation with Mary occurred shortly after he entered the home and saw large amounts of blood on the floor and Mary with a large wound on her head. She seemed stunned or in shock, and the full extent of her injuries was unclear. Thus, while there may not have been the looming public threat present in *Bryant*, we cannot say that there was *no* emergency. *Id.* at 375. Saunders faced an unexpected situation and a victim with serious injuries, and he sought to address what could reasonably be perceived as a medical emergency.

¶ 27 One of Saunders' first questions was whether Mary wanted to press charges. But that alone does not make Mary's statements testimonial. "Police officers in our society function as both first responders and criminal investigators. Their dual responsibilities may mean that they act with different motives simultaneously or in quick succession." *Id.* at 368. The same goes for victims, who may have their own "mixed motives when they make statements to the police." *Id.* And, regardless, "whether an ongoing emergency exists is simply one factor — albeit an important factor — that informs the

ultimate inquiry regarding the 'primary purpose' of an interrogation." *Id.* at 366.

¶ 28     Ultimately, the circumstances here demonstrate that Saunders was responding to what could be fairly characterized as a medical emergency, particularly given the extent of Mary's injuries. Further, Saunders testified that Mary seemed "stunned" and was potentially in shock, despite not exhibiting outward emotional distress. Mary's medical condition is important "to the primary purpose inquiry" because it may "shed[] light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one." *Id.* at 364-65. A victim's medical condition also "provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public." *Id.* at 365.

¶ 29     Finally, Mary made the statements in an informal setting shortly after the assault, minutes after Saunders arrived and before medical personnel arrived. *See id.* at 366. The totality of the circumstances indicates that the primary purpose of Mary's statements was not to serve as an out-of-court substitute for trial

testimony and that these statements were nontestimonial. *Garcia,*
¶ 9.

### b. Excited Utterances

¶ 30    We also conclude that Mary's statements were admissible under CRE 803(2) as excited utterances. To the first factor — whether "the occurrence or event was sufficiently startling to render inoperative the normal reflective thought processes of an observer" — an assault is a sufficiently startling event. *King,* 121 P.3d at 237; CRE 803(2); *see People v. Martinez,* 18 P.3d 831, 835 (Colo. App. 2000) ("The victim's injuries are direct evidence that an assault — clearly a 'startling event' — occurred."). The third factor — whether "direct or circumstantial evidence supports an inference that the declarant had the opportunity to observe the startling event" — is also met. *King,* 121 P.3d at 237-38. As the victim, there is clearly sufficient evidence for the inference that Mary had an opportunity to observe the attack. *See Martinez,* 18 P.3d at 835.

¶ 31    The most important factor here is the second — whether the statements were "a spontaneous reaction to the event." *King,* 121 P.3d at 237; CRE 803(2). Factors we may consider regarding this issue include

15

> the lapse of time between the startling event or condition and the out-of-court statement; whether the statement was a response to an inquiry; whether the statement is accompanied by outward signs of excitement or emotional distress; and the declarant's choice of words to describe the startling event or condition.

*Compan v. People*, 121 P.3d 876, 882 (Colo. 2005), *overruled on other grounds by*, *Nicholls*, 2017 CO 71.

¶ 32    The length of time between the event and the statements is a crucial consideration. *See People v. Vanderpauye*, 2023 CO 42, ¶ 47. Here, Mary's statements were made fifteen to twenty-five minutes after the attack. But "[t]here is no bright-line time limitation 'because the duration of stress will obviously vary with the intensity of the experience and the emotional endowment of the individual.'" *People v. Stephenson*, 56 P.3d 1112, 1116 (Colo. App. 2001) (citation omitted). *Compare Martinez*, 18 P.3d at 835 (victim's statements were excited utterances when made fifteen to twenty minutes after being removed from the scene while she was still in pain and in emotional distress), *and King*, 121 P.3d at 238 (victim's statements to an officer over a "two-hour period" were excited utterances when victim was still "hysterical" at times, bleeding, and receiving medical treatment), *with People v. Pernell*, 2014 COA 157,

¶¶ 34-35 (although the victim was distraught, her statements to an officer were not excited utterances when made a day after the assault because evidence indicated she had engaged in reflective thought). And while there was some time for Mary to potentially engage in reflective thought, her statements were made shortly after the assault and while she was still suffering from serious injuries, supporting the contention that they were spontaneous reactions.

¶ 33     Regarding the other factors, Mary's statements were responsive to Saunders' questioning, and she was not distraught or hysterical. But Saunders testified that Mary appeared "stunned" or in shock, and nothing in her statements plainly indicates that she engaged in reflective thought. Therefore, these considerations do not outweigh those indicating that Mary's statements were spontaneous. *See Pernell*, ¶ 34; *People v. Hulsing*, 825 P.2d 1027, 1031 (Colo. App. 1991); *see also King*, 121 P.3d at 238 ("[T]he excited utterance exception extends to statements made in response to questioning.").

¶ 34     Overall, the evidence supports that Mary's statements were spontaneous reactions to the attack. Even if she was somewhat calm during Saunders' questioning, she made the statements

17

shortly after the attack and while she was still in shock and seriously injured.  *See Compan*, 121 P.3d at 882.

¶ 35    The district court properly found that Mary's statements were nontestimonial, and the record supports its decision to admit them as excited utterances.  *See Martinez*, 18 P.3d at 835 ("If the evidence supports the trial court's ruling, we will not disturb it.  The trial court is in the best position to consider the effect of the startling event on the declarant; thus, it is afforded wide discretion in determining admissibility under the excited utterance exception." (citation omitted)).

B.    Mary's Hearsay Statements to the Defense Investigator

¶ 36    Before trial, Mathews moved to admit Mary's hearsay statements made in a phone interview with a defense investigator and Mathews' attorney in April 2019, over a year after the attack, pursuant to the "residual hearsay" exception under CRE 807.  The interview was documented in a report the investigator created and included statements, for example, (1) that Mary had "some memories of the day in question" and why they were arguing; (2) that explained how the assault started; (3) that Mathews punched her in the face twice, hit her head on the ground, and tried to hit

her again, but she blocked the hit; (4) that Mathews was on medication and may have been drinking that night; (5) that Mary thought Mathews "had snapped, because initially she believed he came into her room to just have a conversation, and instead he hit her"; (6) that explained why Mary recorded the incident; and (7) that Mary "never thought her life was in danger" and "she did not feel threatened when [Mathews] said 'I want to kill you' because it is something people always say."

¶ 37 At a hearing, the defense sought to admit all the statements in the report through the investigator, save for statements that (1) Mary "said she never pressed charges against [Mathews]" and wanted him "to take a deal . . . because she does not want him spending the rest of his life in prison"; and (2) while Mary "does not think they need to see each other anymore, she does not want [Mathews] to spend the rest of his life in jail." The defense argued that the statements were necessary — especially after Saunders testified to Mary's hearsay statements — and that CRE 807 supported their admission. The prosecution objected.

¶ 38 The court found that the statements lacked sufficient circumstantial guarantees of trustworthiness for admission under

19

CRE 807. It noted that Mary's statement that she had "some memories" of the night of the attack indicated that she did not have a "clear recollection"; that Mary made the statements "after [fourteen] months of reflection, realiz[ing] that her son could be spending the rest of his life in jail" and "clearly didn't want that to happen"; and that Mary was simply "a mom trying to save her son."

¶ 39 The court added that — trustworthiness notwithstanding — to the extent any statements described the event, they were not the most probative evidence — the audio recording was. The audio recording was also more probative of statements made before, during, and after the assault. Further, the officer's testimony was more probative of whether Mathews was drunk that night, if Mary heard Mathews on the 911 call, and whether Mathews hit her. Other statements, including why Mary said she was recording the incident, that she was shocked by the first degree murder charge, and that Mathews would not try to kill her and had not been violent before, were irrelevant.

¶ 40 However, the court cautioned that any statements in the report that contradicted Mary's other hearsay statements could be admitted as impeachment of prior inconsistent statements. At trial,

the only statement from the report that was admitted (through the investigator) was that Mary told the investigator that "she went to her room, and then . . . Mathews came into her room, grabbed her shirt by the shoulder. She was hit in the face two times, and then her head hit the ground. He went to hit her one more time, but she blocked the hit."

¶ 41 Mathews contends that the court's decision to exclude Mary's statements to the investigator as insufficiently trustworthy or inadequately probative is reversible error that violated his right to present a complete defense at trial.

1. Standard of Review and Applicable Law

¶ 42 "Trial courts have considerable discretion in determining the admissibility of evidence, including whether the residual hearsay exception applies and whether the evidence has logical relevance." *People v. Brown*, 2014 COA 155M-2, ¶ 18. We therefore review the district court's decision to exclude evidence on CRE 807 grounds for an abuse of that discretion, but "[a]n erroneous evidentiary ruling may rise to the level of constitutional error if it deprives a defendant of his . . . right to present a defense or to conduct meaningful cross-examination on material issues." *Brown*, ¶¶ 6, 18.

21

¶ 43    Yet "a defendant's right to present a defense is violated 'only where the defendant was denied virtually his . . . only means of effectively testing significant prosecution evidence.'" *Id.* at ¶ 6 (quoting *Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009)). As a result, "when an evidentiary limitation does not deprive a defendant of his . . . only means of testing prosecution evidence, reversal is required only if any error substantially influenced the verdict or affected the fairness of the trial." *Id.*

¶ 44    CRE 807 provides that

> [a] statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

¶ 45    "In evaluating the trustworthiness of a statement, we examine the nature and character of the statement, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which the statement was

22

made." *People v. McFee*, 2016 COA 97, ¶ 19. Finally, a statement's reliability "should be determined by the circumstances that existed at the time the statement was made." *Vasquez v. People*, 173 P.3d 1099, 1107 (Colo. 2007). "The proponent must establish the trustworthiness of the statement by a preponderance of the evidence." *Brown*, ¶ 20.

### 2. Application

¶ 46 We conclude that the district court did not abuse its discretion by excluding the statements because they did not demonstrate sufficient circumstantial guarantees of trustworthiness. The record supports the court's findings that Mary's statement that she had "some memories" of the incident indicated that she did not totally recall that night, and the long reflection time along with her desire that Mathews not face a lengthy prison sentence evidenced a motive for making the statements.

¶ 47 This probable motive for Mary's statements is crucial because a declarant's possible motive to lie undermines the circumstantial trustworthiness of the statements. *Cf. People v. Draper*, 2021 COA 120, ¶ 83, *overruled on other grounds by*, *Garcia v. People*, 2023 CO 30 (statements had circumstantial guarantees of trustworthiness

because victim had no apparent motive to lie when she said she cheated on her husband and he threatened her before her death); *see also McFee*, ¶ 21 (finding circumstantial guarantees of trustworthiness when the declarant "had no motive to lie"). Here, the investigator's report evidences that Mary had a clear motive to make the statements to protect her son. This is true even if her original desire not to press charges, expressed to Saunders the night of the assault, remained consistent with her statements to the investigator. This probable motive undermines any circumstantial guarantees of trustworthiness for Mary's statements.

¶ 48    Further, rather than being spontaneously made to family or close friends, Mary made the challenged statements over a year after the attack and before trial, during questioning with a defense investigator and Mathews' attorney. *Cf. People v. Fuller*, 788 P.2d 741, 745-46 (Colo. 1990) (Declarant "made spontaneous statements to two close friends."); *McFee*, ¶ 21 (finding declarant's statements trustworthy in part because "they were made spontaneously to close family members"). She also made the statements a week after the defense investigator contacted her, so she had prior knowledge of the conversation and thus time to reflect on what to say.

¶ 49    Mathews contends that the court's focus on Mary having significant time to reflect is misplaced, arguing that — rather than undermining the reliability of her statements — it shows that the potential accuracy of her account increased with time, as evidenced by the additional detail in her statements compared to those made to Saunders.  But this contradicts Mary's own statement that she had only "some memories" of that night, and the additional detail in her subsequent statements also demonstrates the risk of a probable motive behind them.

¶ 50    Finally, many statements admitted under the residual hearsay exception were made *before* the events in question, which may evince additional trustworthiness.  *See McFee*, ¶ 23 (Statements relaying "prior threats were offered to establish the material fact" of the relationship's volatility and the defendant's "motive for the murder."); *see also Fuller*, 788 P.2d at 745-46 (Victim's statements before her death that "the defendant kept guns in the house and threatened her with them" were probative of the defendant's motive to kill her.); *Brown*, ¶¶ 23-24 (Declarant's statements to sister before declarant was killed "had particularized guarantees of trustworthiness and went to [the] defendant's motive.").

¶ 51 In contrast, Mary's statements to the investigator occurred well after the events in question, supporting the possibility that she may have had a motive for making them. And we must determine the statements' reliability from "the circumstances that existed at the time [they were] made." *Vasquez*, 173 P.3d at 1107.

¶ 52 In sum, the district court did not err by excluding Mary's statements to the investigator on the grounds that they lacked circumstantial guarantees of trustworthiness. This threshold issue alone is sufficient to justify their exclusion, and we therefore need not address the other criteria required to admit hearsay under CRE 807. And because the evidence was properly excluded, the court did not violate Mathews' right to present a defense. *See Brown*, ¶ 6.

### C. The Jury's Access to the Audio Recording

¶ 53 As mentioned, Mary recorded the attack on her cell phone. This recording was crucial evidence and a key focus in the case.

¶ 54 A twenty-three-minute excerpt of the recording (which is over an hour long) was admitted at trial and played for the jury. Parts of the excerpt were also played and discussed during closing arguments, and both sides emphasized that the jury should listen to the recording.

¶ 55    After the jury began deliberating, the defense requested that the court not give the jury unfettered access to the recording, arguing that *DeBella v. People*, 233 P.3d 664 (Colo. 2010), controlled.  The defense argued that the jury should only be allowed to replay the recording once in the courtroom to ensure that the jury did not give it undue weight.  The prosecution, in turn, contended that *DeBella* was distinguishable and that both parties relied on the recording to argue their theories of the case.

¶ 56    The court found that *Rael v. People*, 2017 CO 67, controlled and that *DeBella* did not apply because the recording was nontestimonial evidence.  The court noted that even if *DeBella* applied, it would still support giving the jury unfettered access to the recording, which would aid the jury without unduly prejudicing Mathews because both sides relied on the recording, and it was the jury's role to decide which parts to focus on.  The court ultimately decided that if the jury requested the recording, the court would allow unfettered access to it during deliberations.  The jury asked for the recording shortly after the court's ruling, and the court provided the admitted excerpt.

¶ 57   On appeal, Mathews argues that the court failed to ensure that the jury did not give undue weight to the recording and that *DeBella*, not *Rael*, controls because the recording was testimonial. Further, he challenges the finding that the recording would not unduly prejudice him because the defense relied on portions of the recording only after the court overruled its argument to exclude the recording. Mathews contends that the alleged error warrants reversal because it likely influenced the trial's outcome.

### 1.   Standard of Review and Applicable Law

¶ 58   "[T]he trial court in criminal proceedings has an obligation, much as it does with regard to the admissibility of evidence generally, to assure that juries are not permitted to use exhibits in a manner that is unfairly prejudicial to a party." *Frasco v. People*, 165 P.3d 701, 704 (Colo. 2007). We review a district court's decision to allow or limit the jury's access to exhibits during deliberations for an abuse of discretion because "[c]ontrol over the use of exhibits during jury deliberations rests firmly within the trial court's discretion, and we may not substitute our own judgment for that of the trial court merely because we would have reached a different conclusion." *Rael*, ¶ 15; *see DeBella*, 233 P.3d at 666-67.

Even if preserved, we may reverse "[o]nly those erroneous rulings that 'substantially influenced the verdict or affected the fairness of the trial.'" *DeBella*, 233 P.3d at 667 (citation omitted).

¶ 59    In *DeBella*, a district court provided the jury in a child sexual assault case with unrestricted access to a "videotape[] of the victim describing the incidents underlying DeBella's charges." *Id.* at 665-66. The Colorado Supreme Court held that it was an abuse of the district court's discretion to do so without any limiting instructions or exercise of control and when the court failed to "assess the potential for undue prejudice." *Id.* at 668. The supreme court reversed the convictions because it had "grave doubts" as to "whether the jury's unencumbered access to the tape during its deliberations adversely affected the fairness of the trial." *Id.*

¶ 60    The court noted that "as the only complete recounting of the assaults, the videotape was the linchpin of the prosecution's case" and that "[a]llowing the jury to pore over the tape only marginally facilitated a comparison between that exhibit and the victim's trial testimony, of which jury members only had their memory." *Id.* at 669. In comparison to these marginal benefits, unfettered access to the video posed a heightened danger "of providing the jury with

29

unchaperoned access to only one side of the story" given the importance of the victim's credibility to the case. *Id.*

¶ 61    In *Rael*, ¶¶ 5, 9-10, by contrast, the jury had unrestricted access to two video exhibits during deliberations, "one showing the crime scene and the other a police interview of Rael." For the crime scene video — a silent "first-person perspective . . . trip through the victim's apartment, from outside the building to inside the bedroom where the victim's body lay" — the supreme court held that *DeBella* did not apply because it "does not control jury access to non-testimonial exhibits like the crime scene video." *Id.* at ¶¶ 6, 21.

¶ 62    The court noted that *DeBella*'s "analysis hinged on the nature of the exhibits at issue, namely, the victim's videotaped, out-of-court statements detailing the charged sexual assaults." *Id.* at ¶ 22. The concern with such exhibits is that "honoring requests for access in the jury room to witnesses' out-of-court statements effectively puts the witness in that room during deliberations and creates a risk that the jury will place undue weight or emphasis on the out-of-court statements." *Id.* But this "same danger of undue emphasis does not inhere in non-testimonial evidence." *Id.* at ¶ 23.

¶ 63    As for the video interview, the court held that *DeBella* also does "not apply to a defendant's own out-of-court statements." *Id.* at ¶ 35.  Thus, while district courts "retain discretionary control over jury access to such exhibits," a jury may review videos of a defendant's own statements without restriction.  *Id.*; *see also People v. Shannon*, 2024 COA 41, ¶¶ 21-23 (recorded conversation between victim and the defendant in which the defendant admitted to having sex with the victim while she was underage were properly given to the jury without restriction during deliberations).

¶ 64    Testimonial statements, as discussed *supra* Part II.A.1, are those that, under the totality of the circumstances, objectively reasonable participants would have believed were made with the primary purpose of serving as an out-of-court substitute for trial testimony.  *See Garcia*, 2021 CO 7, ¶¶ 9-10; *see also Bryant*, 562 U.S. at 360.  Some exhibits and evidence may also be testimonial. *See People v. Merritt*, 2014 COA 124, ¶¶ 45, 60 (Autopsy report was testimonial because the "circumstances surrounding the victim's death . . . and the ensuing autopsy suggest that the autopsy report was created primarily for the purpose of gathering evidence to use" at trial.); *cf. Williams v. Illinois*, 567 U.S. 50, 84 (2012) (DNA report

was nontestimonial when its primary purpose, "viewed objectively, was not to accuse [the] petitioner or to create evidence for use at trial" but was instead to locate a suspect "still at large."), *abrogated by*, *Smith v. Arizona*, 602 U.S. 779 (2024).

## 2. Application

¶ 65    We conclude that the court did not abuse its discretion by allowing the jury unrestricted access to the excerpt of the audio recording because it was not a testimonial exhibit, and it does not implicate *DeBella*'s concern about giving the jury "unchaperoned access to only one side of the story." 233 P.3d at 669.

¶ 66    We first note that, like in *Rael*, ¶ 35, and *Shannon*, ¶¶ 21-23, the recording contained Mathews' own statements; thus, it was within the district court's discretion to allow the jury unrestricted access to the recording. The court made this decision after weighing whether the jury would give the recording undue weight and allowing argument from both parties on the issue while considering relevant cases. And it only granted the jury access to the recording upon request. *See Rael*, ¶ 35; *see also DeBella*, 233 P.3d at 669 (District courts have discretion to craft a procedure to ensure the jury does not use exhibits "in a manner that is unfairly

prejudicial," which may include waiting "for a jury's request to review such testimonial exhibits before providing the jury access.").

¶ 67    But, more fundamentally, the recording is not testimonial evidence because it was not made with the primary purpose of serving as out-of-court testimony — it was a tangible exhibit with verbal components depicting the attack. *See People v. Aponte*, 867 P.2d 183, 188 (Colo. App. 1993) (A confidential informant video and transcript of a drug deal were "tangible exhibits with verbal content which [were] non-testimonial in character because they depict[ed] the actual commission of the crime itself."); *see also People v. Mendez*, 2017 COA 129, ¶¶ 54-56 (same); *Rael*, ¶ 23 (citing *Aponte* in support of the proposition that a crime scene video was "more like a non-testimonial, tangible exhibit (such as a still photograph of the crime scene) than a testimonial one (such as a witness's recorded statement)"). And "[j]urors may have access during deliberations to nontestimonial recordings that depict the event itself rather than a narration thereof." *People v. Russom*, 107 P.3d 986, 989 (Colo. App. 2004) (audio recording of drug sale was nontestimonial).

¶ 68    Furthermore, Mary's statements to the defense investigator (which were not admitted at trial) indicate that she did not create the recording with the intent that it be used at trial.  She said she planned to record Mathews to make a point and told the investigator she forgot about the recording until after the assault.  *See Garcia*, 2021 CO 7, ¶ 10 (courts must also look to "the statement's primary purpose when it is made").

¶ 69    The court properly exercised its discretion by allowing the jury unfettered access to the audio recording, which contained Mathews' own statements and was nontestimonial.  And the court did so after properly weighing the risks of the jury giving it undue weight by soliciting arguments from both sides, considering relevant case law, and awaiting the jury's request for the recording.

### D.    Cumulative Error

¶ 70    Mathews finally contends that even if none of the above errors warrant reversal, the district court's alleged errors cumulatively prejudiced him and warrant reversal.

¶ 71    We review claims of cumulative error de novo.  *Howard-Walker v. People*, 2019 CO 69, ¶ 22.  Cumulative error occurs when "[n]umerous formal irregularities, each of which in itself might be

deemed harmless, . . . in the aggregate show the absence of a fair trial, in which event a reversal would be required." *Id.* at ¶ 24 (citation omitted). Cumulative error may warrant reversal when "the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process." *Id.* (alteration in original) (citation omitted). But "cumulative error requires that numerous errors be committed, not merely alleged." *People v. Conyac*, 2014 COA 8M, ¶ 152.

¶ 72    Because we conclude that the district court did not err with respect to any of Mathews' three contentions, cumulative error did not occur. *See People v. Valdez*, 2017 COA 41, ¶ 51.

### III.    Disposition

¶ 73    We affirm Mathews' convictions.

JUDGE BROWN and JUDGE MEIRINK concur.